614 A.2d 534 (1992)
In the Matter of A.S. a/k/a D.S.
No. 91-FS-1024.
District of Columbia Court of Appeals.
Argued September 24, 1992.
Decided October 16, 1992.
Joseph B. Tulman, Washington, D.C., appointed by this court, for appellant.
*535 Sidney R. Bixler, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.
Before ROGERS, Chief Judge, FERREN, Associate Judge, and NEWMAN, Senior Judge.
ROGERS, Chief Judge:
Appellant A.S., adjudicated delinquent because of his involvement in distribution of cocaine, a controlled substance, in violation of D.C.Code § 33-541 (1988 Repl.), appeals on the ground that the trial judge erred by denying his motion to suppress tangible evidence, a pre-recorded twenty dollar bill. Because the police lacked particularized articulable suspicion when they stopped three suspects, one of whom was appellant, their seizure of appellant was not reasonable under the Fourth Amendment, and therefore the money should have been suppressed. Accordingly, we reverse and remand.

I
Appellant filed a pretrial motion to suppress all physical evidence  a pre-recorded twenty dollar bill which had been seized from him by the police  as the fruit of an arrest in violation of his Fourth Amendment rights.[1] At the suppression hearing the government's evidence showed that at approximately 7:40 p.m. on January 31, 1991, Officer Chante Brodie of the Metropolitan Police Department, assigned to the Rapid Deployment Unit and working undercover, went to the area of 4th and Decatur Streets, N.W., in an effort to purchase illegal drugs. Officer Brodie approached appellant, who was standing with approximately four other youths on the northeast corner of 4th and Decatur Streets, and asked him whether he was "in business." Appellant asked Officer Brodie, "what do you want?" and she replied "a twenty." Appellant left, running north up 4th Street, and "his friends then told [Officer Brodie] to stand by, ... [to] stay here and he'll be right back." Appellant returned a short time later with a ziplock bag, containing a rock-like substance, which he gave to Officer Brodie in exchange for a pre-recorded $20 bill.[2]
Officer Brodie then left the area and broadcast a "lookout" to the arrest team in which she stated that there were "five subjects standing on the corner, [and] all of them seemed to be dressed alike." Nevertheless, Officer Brodie described appellant only as "a black male, had on a blue jacket, gray sweatshirt, dark jeans with black skull cap."[3] Officer Brodie's "lookout" contained no information of height, weight, build, facial hair or features of the drug seller. Nor did it contain any information as to possible roles in the drug transaction which might have been played by the other young men standing on the corner.
Officer Manuel Suber testified that on the evening of January 31, 1991, he was working on the Rapid Deployment Unit as a member of the arrest team located near 5th and Decatur Streets, N.W. After hearing the "lookout" broadcast by Officer Brodie, Officer Suber proceeded to 4th and Decatur Streets. From approximately half a block away, Officer Suber noticed three young men and, as he approached, he determined that "it had to be one of the *536 three."[4] All three men fit the description broadcast by Officer Brodie; no one from the arrest team radioed back to Officer Brodie to request additional information that would distinguish the alleged drug seller from the others.[5] Officer Suber testified that he believed that the individual for whom the broadcast was issued could have been "any of the three," and that he "just happened to grab [appellant] and the other officers stopped the other two people."
The officers frisked the three youths for weapons, but none were found. The arrest team then notified the undercover officer that they had "several subjects stopped and to drive by for a positive identification for the one that actually sold [drugs] to the undercover officer." Officer Brodie drove by and identified appellant as the youth who had sold her drugs "based ... on the facial description that I remember, the body build and the clothing." An officer then searched appellant and recovered the pre-recorded $20 bill.[6]
The trial judge denied appellant's motion to suppress the twenty dollar bill. The judge found that there was no
indication that the respondent in this case had the missing tooth or the  the red arrow on his forehead or the scar or  or something that in an easy shorthand quick way of describing in a fast moving situation over the radio would allow the undercover to quickly communicate to other people which of the similarly attired people it was precisely.
The judge further found that Officer Brodie "did include a complexion description," and that the officer "indicated that he was young and  and gave a much more specific clothing description than you often see in these and other kind of fast moving situations." [Id.] Thus, the trial judge found "that the police in this case did have reasonable articulable suspicion to stop this respondent. And I will go so far as to say that they also had reasonable articulable suspicion to stop the other two." [Id.] Finally, the judge stated that:
it would be totally unreasonable to expect arrest teams working with undercover officers on narcotics cases to ride in and if  and if they ever see more than one person meeting the description to then pause and radio for additional information because any suspect  I mean anybody who really was involved would surely recognize their arrival immediately.... [A]rrest teams simply don't have those moments to radio for additional distinguishing information and still have any chance at all of preserving the status quo and being able to still have suspects to choose from.

II
"As a general proposition, it may be said that the greater number of identifying characteristics which are available, the more likely it is that there will be grounds to arrest a person found with all or most of these characteristics." 1 W. LAFAVE, SEARCH AND SEIZURE, § 3.4(c) at 741 (2d ed. 1987). "Descriptions applicable to large numbers of people will not support a finding of probable cause." Brown v. United States, 590 A.2d 1008, 1017 (D.C.1991) (citing Commonwealth v. Jackson, 459 Pa. 669, 673-673, 331 A.2d 189, 191 (1975)). It is undisputed by the parties that the question on appeal is thus not whether the police had probable cause to arrest appellant and the other two men, but whether they instead had reasonable suspicion to support an investigative stop of the three.
This court may not disturb the motions court's findings of fact unless they are clearly erroneous. United States v. Lewis, 486 A.2d 729, 732 (D.C.1985); *537 Brooks v. United States, 367 A.2d 1297, 1302 (D.C.1976); D.C.Code § 17-305 (1981). Thus, our analysis turns upon whether "the motions court's resolution of conflicting testimony and factual findings lacked substantial support in the evidence." Lewis, supra, 486 A.2d at 732 (citing United States v. Alexander, 428 A.2d 42, 50 (D.C. 1981); D.C.Code § 17-305(a) (1981); United States v. Lyon, 348 A.2d 297, 299 (D.C. 1975)).
Appellant contends that the police lacked the requisite particularized, articulable suspicion that appellant was, or was about to be, engaged in criminal activity when the police seized him and two other young men, and that consequently, the motions judge erred by denying his motion to suppress the pre-recorded $20 bill. He maintains that because Officer Brodie's lookout "included the information that there were approximately five individuals at the location of the sale who met the clothing description," Officer Suber and the other members of the arrest team knew that they had insufficient information with which to determine which individual had actually sold the cocaine to Officer Brodie. Thus, appellant contends, "before driving to the scene, [the arrest team] should have requested information that would have made the description of the seller distinctive." [id] Because only one individual was suspected of criminal conduct, appellant argues, in stopping three young men on the theory that "it had to be one of the three," the police lacked the requisite "particularized and objective basis for suspecting the particular person stopped of criminal activity," United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), and thus his seizure by the police violated the Fourth Amendment. The government responds that although the police did not have probable cause to arrest any of the three men they stopped who fit the description in the "lookout," the police did have "reasonable suspicion" to suspect that "[appellant] might have been involved in the sale of drugs, and that under Terry v. Ohio, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), the stop of [appellant] and the two others was a lawful investigative stop."
It is well established that:
a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.
Terry, supra, 392 U.S. at 22, 88 S.Ct. at 1880. Such circumstances exist when a police officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Id. at 21, 88 S.Ct. at 1880; see also Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (police officer must have "articulable and reasonable suspicion"); Brown v. Texas, 443 U.S. 47, 53, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("reasonable suspicion"). Moreover, such suspicion must be "particularized" as to the individual stopped. Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695; Duhart v. United States, 589 A.2d 895, 898 (D.C. 1991). In determining what cause is sufficient to authorize the police to stop a person, the Supreme Court has held that "the totality of the circumstances  the whole picture  must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695 (citing Brown v. Texas, supra, 443 U.S. at 51, 99 S.Ct. at 2641; United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)). The process "does not deal with hard certainties, but with probabilities," but it must "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id. "This demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." Id. (quoting Terry, supra, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18).
This court has made clear that seizures must be made on a particularized and individualized *538 basis. Thus, in Cauthen v. United States, 592 A.2d 1021 (D.C.1991), the court held that a citizen complaint that three or four persons were selling drugs on a certain corner, without physical description of suspects or of an object near which they could be found, did not provide police with requisite "particularized and objective basis for suspecting the particular person stopped of criminal activity," and thus there was no reasonable suspicion of the defendant. 592 A.2d at 1023. Given the existence of a convenience store, gas station, and bus and taxi stops, and the presence of other people throughout the block, the court concluded that "the lack of specificity in the tip leaves too much uncertainty whether the persons the police saw at the corner were the same ones the caller had identified more than a quarter of an hour earlier." Id. at 1024. The court has also rejected articulable suspicion arguments based on guilt by association. See Duhart, supra, 589 A.2d at 898-99 (no "particularized and objective basis for suspecting the particular person stopped of criminal activity" where the officer saw Duhart display "something" to another man on a street in a high drug trafficking area, and the two men dispersed as the uniformed officer approached, Duhart putting something into his pocket and then refusing to answer questions); Smith v. United States, 558 A.2d 312 (D.C.1989) (en banc) (same, Smith seen engaging in conversation with a suspected drug dealer).[7]
The motions judge found the seizure of appellant to be reasonable based on the short time between the sale and the seizure, and that it was "totally unreasonable to expect arrest teams ... to ride in and... if they ever see more than one person meeting the description to then pause and radio for additional information because any suspect ... would recognize their arrival immediately." However, as appellant points out, that is not the circumstance or exigency with which the arrest team was presented.
First, this was not a case in which the police came upon the scene immediately after the drug sale. Although the arrest team was located only a block away, on 5th and Decatur Street, two of the five youths observed by Officer Brodie had apparently already left the corner area where the sale had occurred by the time that the arrest team arrived. Three others were half a block away when observed by the arrest team. The sale occurred in the early evening hours, when it was still likely people would be about, and there were other people in the area. There also was a playground nearby, likely to attract young men to the area.
Second, the lookout itself alerted the members of the arrest team when they first heard it that they would need additional information in order to identify who among the five men was the drug seller. Indeed, Officer Suber testified of his familiarity with the fact that "for years" young men have dressed alike in areas of the city, making clear, appellant suggests, that the broadcast described "a potentially staggering number of youths in the quadrant of the city where the arrest took place.". Officer Suber explained that:
This is street knowledge, even  I grew up in the District of Columbia. Growing up, it was the same way. It's not something that's just started. It's something that's been like this for years. All black meaning it's for that area. You've got to fit in. It's  it's a gang-type related  it seems to be getting bigger now. It's one area wear all black and they they'll have a Raiders cap on. Another section of the city, Northwest, they'll wear all black with an L.A. Kings hat or something like that. And another area you'll see gray  *539 gray and black. It depends on the division of the city.
Thus, in his testimony, Officer Suber implicitly acknowledged that the description broadcast by Officer Brodie could have fit not merely the five individuals on the corner of 4th and Decatur Streets, N.W., but a potentially much greater number of youths in the area.
Third, this was not a situation, as the motions judge posited, where the arrest team was unable to request additional information because it had already arrived on the scene and risked jeopardizing the investigation by the likely flight or unusual behavior of the suspects. According to Officer Suber, the arrest team saw the three youths when the arrest team first entered the block, and he decided it had to be one of the three as he got closer, midway in the block away. The three youths did not run or act in an unusual manner when the arrest team saw them.[8] But even if the arrest team had been on the scene or seen the three men immediately after first hearing the lookout, there was no way for the arrest team to determine whether the drug seller had already left the area or was one of the three remaining youths. Officer Suber was never asked how, despite his knowledge that there were at least five young men in the area meeting the description broadcast by the undercover officer, he reached the conclusion that "it had to be one of the three" he saw on the street, and not one of the (at least) two who were no longer on the scene.
Our decision in Brown v. United States, 590 A.2d 1008 (D.C.1991), cited to the motions judge, makes clear that the police do, as a matter of routine, request additional information over their radios in order to narrow the field of possible suspects before seizing anyone. In that case a uniformed police officer in a marked car had monitored a radio run for a drug seller in the immediate area where the officer happened to be patrolling. The officer observed fifty people in the area, and based on the radio run he narrowed the likely suspect to two men. He then used his police radio to request that the description be broadcast a second time. Upon rehearing the broadcast the officer was able to eliminate one man based on his height and clothing. 590 A.2d at 1010-11.
Fourth, this is not a case in which a more particularized description of the drug seller was impossible. While acknowledging that the broadcasting officer should provide distinctive characteristics of the suspect who is sought, the motions judge found that there were no distinctive markings  no missing tooth, red arrow on his forehead or scar , and implicitly that Officer Brodie could not have broadcast anything distinctive about the drug seller. But Officer Brodie testified that she identified appellant by his facial features and the build of his body. There is nothing to show that she could not have provided her impressions to the arrest team.[9] Rather the officer testified that she gave particular attention to facial features and build:
I based the identification on the facial description that I remember, the body build and the clothing. When I walk into the area to purchase narcotics, my main focus would be on the face because I know that it would be  I will be called upon to identify him at a later time. So, I focus myself, when I'm making a transaction, to look directly at the person, look at his face to make sure that I can identify him and then look at his body build and his clothing.
Moreover, Officer Brodie knew when she gave her description that it would be impossible for the arrest team to distinguish between the drug seller and the other four men since they were all identically dressed. As appellant stated, "[t]herefore, it was a virtual certainty that innocent individuals (probably four individuals) would be deprived of constitutional rights because Officer *540 Brodie failed to provide the facial description and body build information that she used moments later to make the identification."
Not only has this court rejected "associational" and "locational" taints, Smith, supra, 558 A.2d at 319, it is clear that the kind of dragnet seizure of three youths who resembled a generalized description cannot be squared with the long-standing requirement for particularized, individualized suspicion. In Roy v. United States, 527 A.2d 742 (D.C.1987), the court held that a police officer did not have reasonable suspicion to pat down Roy and his four companions where the officer knew only that there had been a report of an assault with a knife committed by someone in the room where Roy and the others were playing cards. The court noted that "no description of the alleged assailant was given," and that "no information was conveyed... about the time of the assault," and held that "[i]t is the absence of ... specificity, as well as the lack of other evidentiary support, which renders this pat-down unlawful." Id. at 744. To allow the seizure of three people on the basis of a generalized description that would fit many people is directly contrary to "the central teaching of the [Supreme] Court's Fourth Amendment jurisprudence" demanding specificity. See Terry, supra, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18.
Nor can what happened here be upheld as one of those few "circumstances where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602, 624, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989) (upholding regulations on blood, breath, and urine testing of railroad employees; overwhelming need to avoid public disasters in absence of less intrusive means). See also Michigan v. Sitz, 496 U.S. 444, 451, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990) (upholding highway sobriety checkpoints, citing the "magnitude of the drunken driving problem"); I.N.S. v. Delgado, 466 U.S. 210, 223-24, 104 S.Ct. 1758, 1766-67, 80 L.Ed.2d 247 (1984) (Powell, J., concurring in result) (emphasizing the "dimensions of the immigration problem" in upholding the questioning of factory workers about citizenship). The instant case involves an all too routine undercover drug buy. It is replete with alternatives well within normal police procedures. Officer Brodie could have supplied height, weight, body build, or other impressions as part of her broadcast. Immediately upon hearing the broadcast the arrest team could have used their radios to ask Brodie for additional information. Upon first seeing the three youths the arrest team could have requested additional descriptive information.
The government relies on three cases  United States v. Short, 187 U.S.App.D.C. 142, 145, 570 F.2d 1051, 1054 (1978), District of Columbia v. M.M., 407 A.2d 698 (D.C.1979), and United States v. Lewis, 486 A.2d 729, 734 (D.C.1985)  to support its contention that an "overly general description" which is insufficient to provide probable cause to arrest may still create reasonable, articulable suspicion for a stop. These cases are inapposite.
In Short, supra, a "lookout" was broadcast for two male burglary suspects, one of whom was "a Negro male approximately 18 to 19 years old, 5'9" to 5'10" tall, 145 to 155 pounds, with a short Afro-bush haircut and dark complexion ... wearing a camel-colored, waist-length leather jacket and blue trousers." 187 U.S.App.D.C. at 144, 570 F.2d at 1053. When police officers spotted a man meeting that description, they stopped him and gave him a Miranda warning. Before escorting the suspect, Short, to the scene of the burglary, an officer searched him and found a brown bag containing heroin. Although Short could not be identified as one of the burglars, he was charged with a drug offense stemming from the officers' discovery of the heroin. Conceding that the case was a close one, the United States Court of Appeals for the District of Columbia Circuit observed that "the description received over the radio fits many young people in that area of Washington," and concluded *541 that "the proffered grounds for probable cause were insufficient to narrow the number of suspects to a level tolerable under the Fourth Amendment." Id. at 145, 570 F.2d at 1054. However, the court held that when the officer spotted Short "he had reasonable, articulable suspicion that [Short] might be connected with the crime, and this was sufficient to warrant an investigative stop under Terry." Id., 570 F.2d at 1054.
Although the description broadcast in Short could, as the court noted, describe "many young people in that area of Washington," the "lookout" did describe some personal characteristics of the suspect, including his approximate age and height, as well as his hairstyle, in addition to his clothing. In the instant case, although Officer Brodie specifically noted in her radio broadcast that there were approximately five young men, "all pretty much dressed alike," in the area, and only one suspected drug seller, the only element of her description which could arguably have distinguished the suspect from the other young men was the fact that he was "medium-to-dark" complected.[10]
Moreover, the police officers who seized Short spotted only one man meeting the description which had been broadcast, and thus they had a "reasonable, articulable suspicion" that he might be the burglar. In the instant case, however, the officers knew before they stopped appellant and the two other young men that there had been only one young man involved in the drug sale, but that approximately five youths in the immediate area fit the same description. Nevertheless, the officers stopped all three on the theory that "it had to be one of the three." Such a theory lacked the particularity required by the Constitution. See Cortez, supra, 449 U.S. at 417-18, 101 S.Ct. at 694-95; cf. Short, supra, 187 U.S.App.D.C. at 145, 570 F.2d at 1054 (probable cause requirement "meant to minimize the possibility of subjecting innocent people to the harassment and embarrassment of involuntary detention").
The government also relies on District of Columbia v. M.M., 407 A.2d 698 (D.C. 1979), and United States v. Lewis, 486 A.2d 729, 734 (D.C.1985). Both cases, however, are readily distinguishable from the instant case.
In M.M., supra, 407 A.2d at 700, a lookout was broadcast for two robbery suspects described as "black, male, young (approximately 15 to 19), running east on Adams Mill Road toward Columbia Road and one wearing a white or light-colored jacket and the other a bright plaid shirt or jacket." A police officer observed the two respondents, who in his judgment matched the description of the two robbers, about a mile from the scene of the robbery, stopped them, and transported them back to the scene of the crime to be identified by witnesses. The court held that the circumstances  the similarity of youths' clothing to that described in the broadcast, and their presence approximately a mile from the scene of the robbery twenty-five minutes after the crime had occurred  provided articulable suspicion to justify the stop by the police officer. Unlike the instant case, there was nothing in the radio broadcast in M.M. to suggest to the police officer that many people in the immediate area would fit the "lookout" description. Nor, in contrast to the instant case, did the officer stop an entire group in order to identify who among them could have been the robbers.
In Lewis, supra, 486 A.2d at 733 n. 4, a broadcast describing the suspect in a sexual assault in Rock Creek Park stated that he was a "black male in his early twenties, approximately six feet tall, thin build, about 150 pounds, no facial hair, wearing a brown and tan checkered raincoat and a gray sweater." Lewis, stopped by police, was taller and heavier than the broadcast description, but the clothes he was wearing *542 were similar to those described and he had mud and briars on his pant legs. The court held that there was no probable cause to arrest Lewis, but that there was reasonable suspicion to justify an investigatory stop under Terry, supra, 392 U.S. 1, 88 S.Ct. 1868. As in Short, supra, 187 U.S.App.D.C. 142, 570 F.2d 1051, the broadcast in Lewis included personal characteristics such as height and weight absent from the "lookout" in the instant case. Again, as in M.M., supra, 407 A.2d 698, and Short, supra, 187 U.S.App.D.C. 142, 570 F.2d 1051, and unlike the instant case, Lewis was not selected from a group of individuals who roughly fit the broadcast description; nor was there anything in the broadcast to caution officers that there was a group of individuals in the area, all of whom could be described in the same way.
Accordingly, we hold that the police lacked reasonable suspicion to stop the three youths. The arrest team knew at the time the "lookout" was broadcast that there were at least five individuals in the area who fit the description equally well. Indeed, Officer Suber testified that it was "street knowledge" that youths in various sections of the city tended to wear similar clothing. Thus, they knew from the start that they would be unable to identify the drug seller and needed additional identifying information. Further, as they approached the scene of the drug sale, from half a block away, the officers spotted three young men, all of whom fit the description broadcast by Officer Brodie, and speculated that it "had to be one of the three." It is significant, moreover, in view of the motions judge's finding that "police officers simply don't have those moments to radio for additional distinguishing information and ... still have suspects to choose from, "that there is no evidence that any of the three youths made an attempt to flee as the police approached. Under the circumstances, the arrest team was required to request further descriptive details about the drug seller from the undercover officer. Any information which might have distinguished the drug seller from his companions would have sufficed. Indeed, given Officer Brodie's testimony that she identified appellant based on his "facial characteristics" and "body build," even a typical "lookout" description, which included information on age, height, weight, and body build of the suspect, would presumably have given the arrest team the "particularized and objective basis" for suspecting appellant of criminal activity required by the Constitution. In the absence of such information, appellant's seizure was unlawful and the judge erred by denying the motion to suppress the marked $20 bill. Therefore, we reverse and remand the case to the trial court.
NOTES
[1] Appellant also moved to suppress statements he had made to the police at the time of his arrest and claimed that the statements had been obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and the Fifth Amendment, but does not appeal from the denial of that portion of his motion.
[2] Officer Brodie later gave the substance to her partner, Officer Gregory, who field-tested it. The substance tested positive for cocaine.
[3] The trial judge found that Officer Brodie's description also contained the information that the suspect was "medium to dark" complected, and that Officer Brodie "indicated that he was young." On cross-examination, Officer Brodie testified that she had said "medium to dark complected male." But when asked immediately thereafter to repeat her entire broadcast, she did not mention complexion. Officer Suber testified that the broadcast was for "a young juvenile male wearing a black skull cap, dark colored jacket, dark colored pants and a gray sweat shirt."
[4] According to Officer Suber, "they all had on dark skull caps, dark jacket [sic], dark colored pants and gray sweat shirts and they were all the same height and within the same age frame."
[5] Officer Suber testified that "we usually don't have time [to call back to ask for clarification of a description] because then they run and it turns into a chase. We try to prevent that. That's why we just do a stop since everyone fits the description in cases like that."
[6] The other young men were released.
[7] In Smith, supra, the court noted that "[c]ourts in other jurisdictions have been faithful to Sibron [v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968),] and Ybarra [v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979),] in rejecting articulable suspicion arguments based upon guilt by association." 558 A.2d at 315. The court also stated:

Nor can the general nature of the neighborhood reasonably be used, any more than the association with the suspects themselves, to enhance police suspicion that [the defendant] in particular was the "money man" [in an illegal narcotics transaction].
558 A.2d at 319.
[8] There was police testimony that the three youths neither made threats or assaults nor engaged in other misconduct.
[9] Although the government presented evidence that Officer Suber had two years experience, like the officer in Brown, supra, 590 A.2d at 1010, the government offered no evidence about the content of Officer Brodie's experience.
[10] Although Officer Brodie did not testify that she included any reference to the age of the suspect in her broadcast, the trial judge found that Officer Brodie "indicated that he was young." The discrepancy is insignificant because there is no evidence that any of the five men observed by Officer Brodie could be described as other than "young." It is clear, however, than no specific age or age range was included in Officer Brodie's lookout.