**In re S.B., Appellant.**

**No. 10–FS–1366.**

District of Columbia Court of Appeals.

Submitted March 14, 2012.

Decided May 31, 2012.

Jejomar Untalan was on the brief for appellant.

Irvin B. Nathan, Attorney General for the District of Columbia, with whom John J. Woykovsky, Assistant Attorney General, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief for appellee.

Before WASHINGTON, Chief Judge, OBERLY, Associate Judge, and PRYOR, Senior Judge.

WASHINGTON, Chief Judge:

After denying S.B.'s motion to suppress evidence, the trial court found him guilty of possession of a B–B gun, in violation of 24 DCMR § 2301.3 (2008). On appeal, S.B. argues, as he did before the trial court, that the police officers did not have reasonable suspicion to stop and frisk him. For the reasons stated below, we agree and reverse.

## I.

On the night of May 30, 2010, at 9:30 p.m., Officer Travis Reed was on duty at the corner of 6th Street and Alabama Avenue in Southeast, Washington, D.C., recovering a stolen automobile. A male citizen approached Officer Reed and stated that there was a black male wearing white pants, possibly a juvenile, that had a gun in his possession and was "messing around" with a female on the playground in the 600 block of Alabama Avenue. After speaking with the citizen for about thirty seconds, Officer Reed broadcasted a lookout for a black male with white pants, possibly a juvenile, armed with a handgun at the rear of the 600 block of Alabama Avenue on the playground. Officer Reed did not ask the citizen for his name.

At the time Officer Reed broadcast the lookout, Officer Douglas Sarsfield was on patrol in a scout car. Officer Sarsfield made his way toward the 600 block of Savannah Street near the park referenced in the lookout. It took Officer Sarsfield two minutes to arrive at that location. Officer Sarsfield went to the rear of the field where there were about four black males, juveniles, congregated in the park area. One of them had white colored clothing on. Officer Sarsfield was by himself for about a minute and a half before other officers arrived on the scene. Officer Sarsfield told the group of juveniles to stop, and he

conducted a protective pat down. Finding no weapons, Officer Sarsfield let the juveniles go.

Officer Sarsfield testified that he and the other officers remained in the area, and that about three or four minutes later, a number of juveniles came walking through the tennis court area, one of whom was a black male wearing white pants. At the motion hearing, which was incorporated into a bench trial, Officer Sarsfield identified that individual as S.B. Officer Sarsfield approached S.B. from behind and told him to stop. He began to conduct a protective pat down on him. At the same time, Officer Robinson approached S.B. from the front and recovered a B–B gun from S.B.'s front waistband.

S.B. was charged with possession of a B–B gun in violation of 24 DCMR § 2301.3. Prior to trial, S.B. filed a motion to suppress evidence of the B–B gun, arguing that the officers lacked probable cause or reasonable suspicion to stop and frisk him. The trial court denied S.B.'s motion to suppress and found him guilty as charged. This appeal followed.

## II.

S.B. claims that the tip in this case was unreliable, likening the citizen tipster here to the unknown caller in *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). S.B. points out that the police did not obtain any identifying information about the citizen, that Officer Reed spoke to the citizen for just thirty seconds, and that there is no indication Officer Reed even noted the citizen's physical appearance. The government responds that *J.L.* does not apply in cases involving in-person tips and cites cases in which we concluded that an in-person tip provided officers with

reasonable suspicion to conduct a *Terry* [1] stop. The government also maintains that the citizen in this case appears to have personally observed the crime, adding to the tip's reliability.

We hold that the officers lacked reasonable suspicion to stop S.B. Although the tip in this case was somewhat more reliable than the tip in *J.L.*, the tip did not provide the officers with the particularized, individualized suspicion needed to stop and frisk S.B. Therefore we reverse.

### A.

"In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Green v. United States*, 974 A.2d 248, 255 (D.C.2009) (quoting *Shelton v. United States*, 929 A.2d 420, 423 (D.C.2007)) (quotation marks omitted). This court "must give deference to the trial court's findings of fact as to the circumstances surrounding the appellant's encounter with the police and uphold them unless they are clearly erroneous." *Id.* (quotation marks omitted). "However, we review *de novo* the trial court's legal conclusions and make our own independent determination of whether there was either probable cause to arrest or reasonable suspicion" to justify an investigatory stop. *Id.* (quoting *Prince v. United States*, 825 A.2d 928, 931 (D.C.2003)) (quotation marks omitted).

To justify an investigatory stop, "a police officer must have a reasonable, articulable suspicion that criminal activity may be afoot," *Howard v. United States*, 929 A.2d 839, 845 (D.C.2007) (quoting *Wilson v. United States*, 802 A.2d 367, 369 (D.C.2002)) (quotation marks omitted), and the officer's suspicion must be particular-

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

ized as to the individual stopped, *see, e.g.,* *In re K.P.,* 951 A.2d 793, 796 (D.C.2008); *Umanzor v. United States,* 803 A.2d 983, 992 (D.C.2002); *In re T.L.L.,* 729 A.2d 334, 340 (D.C.1999); *United States v. Turner,* 699 A.2d 1125, 1128 (D.C.1997); *In re A.S.,* 614 A.2d 534, 537 (D.C.1992). The lawfulness of an investigatory stop depends on the totality of the circumstances. *Umanzor,* 803 A.2d at 992 (citing *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

■■■ An officer may justify an investigatory stop based on an informant's tip, rather than personal observation, depending on the tip's reliability. A tip's reliability, "like all other clues and evidence coming to a policeman on the scene, may vary greatly." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The key factors contributing to reliability are "the informant's credibility and veracity and the basis of the informant's knowledge." *Joseph v. United States,* 926 A.2d 1156, 1161 (D.C.2007) (citing *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). However, "an informant does not need to state directly the basis of his knowledge because that can often be inferred from the report itself." *Id.* (citing *Groves v. United States,* 504 A.2d 602, 605 (D.C.1986)). "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

■■■ The Supreme Court has provided clear guidance on the reliability of certain tips. At one end of the spectrum, *Adams* involved a tip that "carried enough indicia of reliability to justify the officer's forcible stop" of the defendant, 407 U.S. at 147, 92 S.Ct. 1921, where a known informant approached an officer in person and "informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist," *id.* at 145, 92 S.Ct. 1921. The Court held that the tip was reliable for more than one reason. First, the informant was known personally to the officer and had provided information in the past. *Id.* at 146, 92 S.Ct. 1921. Second, rather than providing "an anonymous phone tip," the informant "came forward personally to give information that was immediately verifiable at the scene." *Id.* Thus, the informant "might have been subject to immediate arrest for making a false complaint" had the officer's investigation proved the tip incorrect. *Id.* at 147, 92 S.Ct. 1921. At the other end of the spectrum, *Florida v. J.L.* involved a tip that lacked sufficient indicia of reliability. There, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. at 268, 120 S.Ct. 1375. Police arrived quickly at the bus stop and found J.L., who matched the description provided by the caller, along with two other black males. *Id.* The police frisked all three and recovered a gun from J.L. *Id.* The Supreme Court held that the police lacked reasonable suspicion to stop and frisk J.L. The Court explained that the "reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 266, 120 S.Ct. 1375. Thus, under *Adams* and *J.L.,* an in-person tip from a known informant is reliable in its assertion of illegality; a telephone tip from an anonymous informant is not.[2]

---

2. Of course, even anonymous telephone tips can give rise to reasonable suspicion if sufficiently corroborated. *See, e.g., White,* 496 U.S. at 331–32, 110 S.Ct. 2412; *Plummer v.*

Somewhat harder to classify, as we have observed, are in-person tips from unidentified citizen informants. *Davis v. United States*, 759 A.2d 665, 671 (D.C.2000).

Consistent with *Adams* and *J.L.*, we have suggested that, all other things being equal, an in-person tip is more reliable than a telephone tip. *See, e.g., Nixon v. United States*, 870 A.2d 100, 104 (D.C. 2005) ("Information conveyed to the police by . . . in-person informants, even if they do not reveal their names, is not subject to the same scrutiny as purely anonymous tips."); *Ware v. United States*, 672 A.2d 557, 563 (D.C.1996) ("[T]he fact that the tip was given in person, rather than over the telephone, further strengthens its credibility."); *Brown v. United States*, 590 A.2d 1008, 1016 (D.C.1991) (noting that "an anonymous telephone tip is of the weakest reliability," and that "[a]nonymity takes on even greater significance where there has not even been a face-to-face confrontation between the person giving the information and the police") (internal quotation marks omitted). There are two features of an in-person tip that enhance its reliability. First, a face-to-face encounter provides police officers the opportunity to observe the citizen's demeanor—"mannerisms, expressions, and tone of voice" [3]—and thus evaluate the citizen's credibility and veracity. *See Nixon*, 870 A.2d at 104 ("[T]he information he provided to the police officers was given in person so that the police were able then and there to assess his reliability."); *see also United States v. Palos–Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010); *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir.2004); *United States v. Thompson*, 234 F.3d 725, 729 (D.C.Cir. 2000); *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir.2000); *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994). Second, an in-person informant risks losing anonymity and may be held accountable for a false report. *See J.L.*, 529 U.S. at 275, 120 S.Ct. 1375 (Kennedy, J., concurring); 462 U.S. at 233–34, 103 S.Ct. 2317 (1983); *Adams*, 407 U.S. at 147 & n. 2, 92 S.Ct. 1921; *Davis*, 759 A.2d at 675; *see also Palos–Marquez*, 591 F.3d at 1275; *Romain*, 393 F.3d at 73; *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir.2000); *United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir.1991).

 The advantageous features of in-person tips have been characterized as inherent, *Thompson*, 234 F.3d at 729, but they are not fixed. Of course, the more time an officer spends observing a citizen, the greater opportunity the officer will have to assess the citizen's credibility and take note of any identifying characteristics that might be used to hold the citizen accountable should the tip prove false. In the same vein, the potential for accountability is greater where a citizen is "driving a car from which his identity might easily be traced," *United States v. Sierra–Hernandez*, 581 F.2d 760, 763 (9th Cir.1978) (Kennedy, J.), than where a citizen is a pedestrian in a crowded public place. Thus, the degree to which the face-to-face aspect of a tip from an otherwise unidentified citizen enhances reliability varies with the circumstances of each case.[4]

*United States*, 983 A.2d 323, 333 (D.C.2009); *Green*, 974 A.2d at 256; *Jefferson v. United States*, 776 A.2d 576, 579–80 (D.C.2001).

**3.** *United States v. Romain*, 393 F.3d 63, 73 (1st Cir.2004).

**4.** As Justice Kennedy pointed out in *J.L.*, the perceived advantages of in-person tips in terms of accountability rely on assumptions related to the difficulties of tracking telephone tips, *see J.L.*, 529 U.S. at 276, 120 S.Ct. 1375 (Kennedy, J., concurring), assumptions that may be disproved over time or in a given case. That prospect does not diminish our observation in this case that, *all other things*

In this case, the face-to-face aspect of the encounter between Officer Reed and the unidentified citizen meaningfully enhanced the tip's reliability. The citizen approached Officer Reed at 9:30 p.m., in a residential neighborhood that is somewhat distant from areas generally populated by tourists and other more transient visitors to the District, to report a crime that was occurring nearby. Thus, under the circumstances, the tip could be confirmed or disconfirmed quickly, and the citizen—who was on foot—risked being located by the police had the tip proven false.[5] In addition, Officer Reed had the opportunity to assess the citizen's credibility while he attempted to gather information about the crime being reported, even if the duration of his encounter with the citizen was brief. The degree to which these circumstances elevate the reliability of the in-person tip over a purely anonymous telephone tip can be debated, but there can be no doubt that these factors differentiate the tip in this case from the tip in *J.L.*

Moreover, the tip in this case was more reliable than the tip in *J.L.* because, unlike the tipster in that case, the citizen here appears to have been a witness to the crime. The citizen approached Officer Reed at 6th Street and Alabama Avenue, close to the playground mentioned in the tip. While the citizen did not tell the officer that he personally witnessed the criminal conduct, viewing the facts and all reasonable inferences in favor of sustaining the trial court's ruling, *see Green*, 974

A.2d at 255, it is reasonable to infer that Officer Reed believed that the citizen's tip was based on firsthand knowledge, *see United States v. Walker*, 294 A.2d 376, 378 (D.C.1972) ("While the citizen here did not specifically say he had seen the pistol in Willie's possession, such was the clear inference from his report."). That the tip was based on firsthand knowledge adds to the tip's reliability, *Ware*, 672 A.2d at 563; *accord Allen v. United States*, 496 A.2d 1046, 1048 (D.C.1985) (citing cases), a factor which informs the level of detail and corroboration necessary to provide officers with reasonable suspicion under the totality of the circumstances, *see White*, 496 U.S. at 330, 110 S.Ct. 2412. Thus, under the circumstances presented here, we are satisfied that the tip was sufficiently reliable such that independent corroboration of the illegality was not necessary before making a *Terry* stop, assuming of course that the content of the tip provided sufficient information to justify the seizure of a particular individual.

### B.

In addition to the reliability of the information possessed by the police, reasonable suspicion depends on the content of such information. *White*, 496 U.S. at 330, 110 S.Ct. 2412. "In order to pass muster under *Terry* and its progeny, the articulable suspicion must be particularized as to the individual stopped." *In re T.L.L.*, 729 A.2d at 340 (quoting *In re A.S.*, 614 A.2d at 537 (internal quotation marks omitted)). Accordingly, "in the absence of

---

*being equal,* in-person tips possess certain inherent advantages over telephone tips.

**5.** If the citizen had been disposed to provide a false report, "it would have been safer to telephone the police station, and such a plan would have minimized the prospect of his apprehension." *Davis*, 759 A.2d at 675. While Officer Reed did not provide a description of the citizen at the August 11, 2010,

incorporated motion hearing and trial, that does not mean Officer Reed would not have been able to recognize the citizen at a time closer to May 30, 2010, when the events giving rise to this case took place. In any event, reliability does not hinge on a guarantee that the officers could locate the citizen again. *See Valentine*, 232 F.3d at 355.

other circumstances that provide sufficient particularity, a description applicable to large numbers of people will not suffice to justify the seizure of an individual." *Id.* (internal quotation marks omitted).

Our cases involving in-person tips from unidentified citizen informants seldom involve descriptions applicable to more than one person, as demonstrated by the cases the government cites in its brief. In *Nixon*, 870 A.2d at 102, a citizen told officers that some persons were using drugs inside a red pickup truck parked in front of his house. *Id.* When the officers went to the location stated by the citizen, there was just one vehicle matching the citizen's description. Although the truck was unoccupied, two men were walking along the sidewalk toward the police car, about twenty feet away from the truck, one of whom was appellant. *Id.* There was no one else in the area. *Id.* Before the officers stopped him, the appellant himself verified that he had just been in the red pickup truck. *Id.* In *Ware*, 672 A.2d at 559, a woman claimed that a man who had just ridden past on a bicycle was selling drugs out of a woman's purse. The woman described a man wearing bicycle shorts, sneakers, no shirt, and no socks. *Id.* The appellant matched the description in all respects, and the officer had just seen him standing on the sidewalk in front of a nearby house. *Id.* In *Galloway v. United States*, 326 A.2d 803, 804–05 (D.C.1974), a citizen described an auto of a specific make, color, and license tag, proceeding in a certain direction and containing two people with a pistol. And in *Walker*, 294 A.2d at 377, a citizen told officers that there was a man named Willie sitting on the porch of a nearby house in the 1400 block of Swann

Street with a gun in his waistband. He described the man as wearing a black shirt and blue knit hat and having an artificial leg. *Id.* By the time the officers frisked Willie, there was no doubt about his identity. *See id.*

By contrast, *In re A.S.*, cited by the court below, involved a description applicable to large numbers of people.[6] There, an undercover officer engaged in a drug transaction with appellant, who was standing on a corner with four other youths. *Id.*, 614 A.2d at 535. The officer then left the corner and broadcasted a lookout, stating that there were "five subjects" and "all of them seemed to be dressed alike." *Id.* (internal quotation marks omitted). Nevertheless, the officer described A.S. only as "a black male [who] had on a blue jacket, gray sweatshirt, dark jeans with black skull cap." *Id.* The lookout contained no information of height, weight, build, facial hair or features of the drug seller. *Id.* Nor did it contain any information as to possible roles in the drug transaction which might have been played by the four other young men standing on the corner. *Id.* The arrest team was a block away, *id.* at 535, but by the time they arrived, two of the five youths had apparently already left the corner area, *id.* at 538. All three men fit the lookout description, and one of the officers testified that the individual for whom the broadcast was issued could have been "any of the three." *Id.* at 535–36. No one from the arrest team requested additional information that would distinguish the alleged drug seller from the others. *Id.* at 536. The arrest team stopped and frisked all three youths before the undercover officer drove by and identi-

---

6. *A.S.* involved a different paradigm than that presented here: the information possessed by the police officers came from other officers, and thus its reliability was unquestioned. Nonetheless, while the officers in this case

had a greater obligation to seek out corroborating details than they would have had the information come from another police officer, *A.S.* and *United States v. Turner*, 699 A.2d 1125 (D.C.1997), are both instructive here.

fied A.S. as the individual who sold her drugs. *Id.* The officers recovered a pre-recorded $20 bill from A.S. *Id.* The trial court denied A.S.'s motion to suppress evidence, but we reversed, holding that the officers lacked reasonable suspicion to stop A.S. *Id.* at 542. Several factors contributed to our holding. The officers had not arrived on the scene immediately after the drug transaction; by the time the officers arrived, two of the youths were no longer on the scene. *Id.* at 538–39. The lookout alerted officers that additional information was needed because it described "a potentially staggering number of youths in the quadrant of the city where the arrest took place." *Id.* at 538 (internal quotation marks omitted). We explained, *inter alia,* that "the kind of dragnet seizure of three youths who resembled a generalized description cannot be squared with the longstanding requirement for particularized, individualized suspicion."[7] *Id.* at 540.

Like *A.S., Turner,* 699 A.2d at 1127, involved a drug transaction between the appellant and an undercover officer. There, the lookout described a black male near 1408 Girard Street that was wearing a black jacket and blue jeans. *Id.* The arrest team arrived within a minute and stopped Turner and another man, both of whom matched the description provided in the lookout. *Id.* The trial court held that the officers lacked particularized suspicion, but we reversed. We explained that, "[t]he fact that the police encountered a second man who also fit the description is a countervailing consideration, but did not necessarily dispel the reasonable suspicion focused on Turner." *Id.* at 1128. Relying primarily on the "close spatial and temporal proximity between the reported crime and seizure," we held that the *Terry* stop

was justified and did not pose the danger of a "dragnet seizure" of the sort we encountered in *A.S. Id.* at 1130.

In this case, as in *A.S.,* the officers acted upon information that was potentially applicable to a large number of individuals. First, unlike *A.S.* and *Turner,* this was not a case in which officers had information that isolated criminal activity to a particular street corner or a particular address. The tip in this case indicated that the individual who was in possession of a gun was on a playground that was part of a larger park area which included a field area and a "whole bunch of sports courts," including basketball and tennis courts.

Second, although the officers arrived on the scene within two minutes, their swift arrival did not provide a basis for individualized suspicion of S.B. The record suggests that the second group of juveniles was not even in the park when the officers arrived on the scene. Meanwhile, the record does not reveal anything about how close the second group of juveniles was to the playground area identified in the tip or what direction the group was traveling when Officer Sarsfield spotted them.

Third, and most significant, the officers failed to corroborate almost every detail of the tip. When Officer Sarsfield arrived on the scene and spotted the first group of juveniles, they were not in the playground, there was no visible evidence that any of them possessed a weapon, and there were no young women or girls in their presence. The only factor that was consistent with the tip was that one of them was wearing white clothing. Nonetheless, Officer Sarsfield approached, stopped, and patted down the entire group. Later, officers spotted a second group of juveniles, including S.B., walking through the tennis courts

---

7. We also explained that the officers could have requested additional information as "the three youths did not run or act in an unusual manner when the arrest team saw them," and that a more detailed description was possible under the circumstances.

into a grassy area near more sports courts. As with the first group of juveniles, the young men were not in the playground area, and the officers did not see anyone with a gun or observe anything to suggest that anyone in the group might have a gun, and the officers did not see anyone in the group in the presence of a young woman. As with the pat down of the first group, all the police had to go on was the fact that one of the young men, S.B., was wearing white pants. At that point, not only did the officers lack a rational basis for differentiating S.B. from the individual in white clothing whom they had just searched (or any other juvenile in white pants who might come along), but the officers now had reason to doubt the accuracy of the information provided by the citizen informant. Based on the totality of the circumstances, the officers lacked reasonable, particularized suspicion to stop S.B. without some additional corroboration that he was likely the individual whom the tipster had identified as the young man holding a gun and messing with a young woman in the playground.

### III.

In light of the foregoing, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

*So ordered.*