*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1450

MELVIN E. JACKSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-10019-13)

(Hon. Robert I. Richter, Trial Judge)

(Submitted January 22, 2015                    Decided February 12, 2015)

*Sidney R. Bixler* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Christian Natiello*, Assistant United States Attorneys, and *Rockne Chickinell*, Special Assistant United States Attorney, were on the brief for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and FARRELL, *Senior Judge*.

FARRELL, *Senior Judge*: Found guilty by the court of multiple firearms offenses on stipulated facts, appellant argues that his motion to suppress the loaded revolver seized from him during a pat-down was wrongly denied, because in stopping him the police relied on an anonymous 911 telephone tip that, he

contends, did not furnish the reasonable suspicion necessary for a lawful stop. Largely on the basis of *Prado Navarette v. California*, 572 U.S. ___, 134 S. Ct. 1683 (2014), we affirm.

## I.

Officer Lina of the Metropolitan Police Department testified that on June 13, 2013, around 8:30 p.m. and as it was getting dark, he received a radio call about a man with a gun standing at the bus stop between Condon Terrace and Fourth Street, Southeast. In the radio call the dispatcher described the man as a black male with a brown shirt. Lina drove south on Fourth Street and, between Valley Avenue and Condon Terrace a minute or two after he got the call, saw appellant standing in front of a church along Fourth Street, wearing a black windbreaker. The officer drove on to the nearby bus stop, but when he arrived no one was there. Other than appellant, Lina saw no persons between appellant at the church and the bus stop.

Lina made a u-turn to drive back up Fourth Street, stopped at Valley Avenue, and called the dispatcher for a better lookout while watching appellant, who was wearing a black skullcap and a black windbreaker poncho. The

dispatcher called back with a description of a black man wearing a black hat and a windbreaker. Four minutes after first spotting appellant in front of the church, Lina and his partner approached appellant at the corner of Valley Avenue and Fourth Street and directed him to turn around and submit to a protective pat-down. During the pat-down, Lina felt what he believed to be a gun on appellant's right side, and pulled a silver revolver out of appellant's right pocket.

On the government's motion, the trial court admitted into evidence a 911 call and the radio dispatch, both recorded on Government Exhibit 4. The 911 call was made by an anonymous female caller,[1] who stated that a man was walking near Fourth and Atlantic, down toward a church or elementary school, and had a silver gun on him. The caller had "[seen the gun] when [appellant] took it out of his pocket," explaining that she had been waiting for her friend to come off a bus when "I see him bring out a silver pistol out of his pocket," and that she then made the 911 call. Seeing the gun, the caller said, "scared the hell out of [her]." She described the suspect as wearing a "brown windbreaker," "raincoat thing," and a

---

[1] The call was recorded and has been provided to us in a compact-disc copy. Although Officer Lina, of course, did not personally hear the 911 call, in situations like this it is the collective knowledge of the investigating officers that counts. *See In re M.E.B.*, 638 A.2d 1123, 1129 (D.C. 1993).

black hat. When the 911 operator stated her own understanding that the suspect was at Fourth Street and Condon Terrace, the caller corrected her, stating that he was "not on Condon Terrace" but was walking down Fourth Street ("not up") toward the elementary school. Officer Lina confirmed that there was a school and church on Fourth Street, and that appellant was standing by the church when he first saw him, with no one else around.

The trial judge credited the testimony of Lina that, in responding to the radio call, he had seen only appellant walking on the block in question. The 911 caller was "a concerned citizen who had just seen a defendant holding a gun and was reporting it contemporaneously." The dispatcher, the judge noted, had initially erred in putting out a lookout for a man wearing a brown shirt, but then gave a more particular description – on which Officer Lina relied – of a man wearing a windbreaker and a black skull cap. The difference in the color description was not material, the judge found, considering that it was getting dark at the time and appellant was the only person on the block when observed. Because, in the judge's view, the stop and frisk of appellant was supported by reasonable, articulable suspicion based on the call, he denied the motion to suppress.

## II.

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Prado Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). When, as here, the basis for the stop is an anonymous tip, the tip must "be reliable in its assertion of illegality" and "in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Tips regarding "unlawful carriage of a gun" enjoy no privileged Fourth Amendment status, *id*. at 272; they too have to "bear standard indicia of reliability in order to justify a stop." *Id*. at 274. *Prado Navarette* is the Supreme Court's latest treatment of anonymous tips, and the reliability features it cited in upholding the investigative stop there persuade us that the police had the required justification for the stop here.

The Court began by reaffirming that "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Id*. at 1688 (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)). The caller in *Prado Navarette* had

reported that her vehicle was run off the road by a truck shortly before, a report that, if reliable, gave the police reason to suspect the truck driver "of an ongoing crime such as drunk driving." *Id*. at 1690-91. The Court then explained why "the [911] call bore adequate indicia of reliability for the officer to credit the caller's account" of what happened to her. *Id*. at 1688.

First, unlike in *Florida v. J.L.*, *supra*, on which appellant mainly relies, the 911 caller in *Prado Navarette* "claimed eyewitness knowledge" of the conduct yielding suspicion. 134 S. Ct. at 1689. That "basis of knowledge len[t] significant support to the tip's reliability," in contrast to *J.L.* where "the tip provided no basis for concluding that the tipster had actually seen the gun." *Id*.[2] Moreover, the "timeline of events [in *Prado Navarette*] suggest[ed] that the caller reported the incident soon after she was run off the road," and this "sort of contemporaneous report has long been treated as especially reliable." *Id*. Whereas "[t]here was no indication that the tip in *J.L.* (or even in *White*) was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a

---

[2] Even in *Alabama v. White*, *supra*, the *Prado Navarette* Court said, "where we upheld the stop, there was scant evidence that the tipster had actually observed cocaine in the station wagon." 134 S. Ct. at 1689.

startling event, . . . those considerations weigh in favor of the caller's veracity here," the Court reasoned.

Finally, another "indicator of veracity is the caller's use of the 911 emergency system," the Court said, because "[a] 911 call has some features that allow for identifying and tracing callers." *Id*. The Court arrayed those features of a standard 911 call, including Federal Communications Commission (FCC) regulations that "permit[] law enforcement to verify important information about the caller." *Id*. at 1690. "Given [these] technological and regulatory developments," it explained, "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id*. "None of this is to suggest that tips in 911 calls are *per se* reliable," the Court added, but "[t]he caller's use of the 911 system is . . . one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call." *Id*.

Appellant scarcely challenges the application of these reliability features to his case – where the caller's report was made just after seeing the suspect pull out a gun "scared the hell out of her" – except to argue that the caller's use of the 911

system has no relevance here. That is so, he says, because there is no indication that the 911 operator tried to trace the caller or call her back after she hung up or, if she did try, was successful in doing so. Those uncertainties, however, do not change the presumed application of the cited FCC regulations to the District's 911 system. Moreover, although the trial court and the parties undertook no examination of the capabilities of the District's system for tracking 911 callers (understandably, since this case was tried before *Prado Navarette*), neither was the local (or California) 911 system closely examined in *Prado Navarette*. *See id.* at 1689-90.[3] That record gap gives us no reason here, any more than in *Prado Navarette*, to discount the fact that "a reasonable officer could conclude that a false tipster would think twice before using such a system." 134 S. Ct. at 1690.

For these reasons, although the issue as in *Prado Navarette* is a "close" one, *id*. at 1692, we are satisfied that when the police saw appellant standing in front of a church on Fourth Street (the caller had said he was walking near Fourth and Atlantic down past a school and church) wearing a black skullcap and black

_____

[3] The Court did note that "911 calls can be recorded, which provides victims the opportunity to identify the false tipster's voice and subject him to prosecution," citing Cal. Penal Code Ann. § 653x (West 2010). *See* 134 S. Ct. at 1690. But the same is true in the District of Columbia. *See* D.C. Code § 22-1319 (a-1) (2012 Repl.).

windbreaker poncho (the caller had reported him wearing a black hat and "brown windbreaker," "raincoat thing"),[4] and with no one else visible between the church and the bus stop where appellant was first spotted, they had sufficient, particularized reason to suspect that he was the man referred to in the caller's tip and was carrying a gun. The tip was reliable both "in its assertion of illegality" and "in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

In arguing to the contrary, appellant relies also on our decisions in *In re S.B.*, 44 A.3d 948 (D.C. 2012), and *Plummer v. United States*, 983 A.2d 323 (D.C. 2009), both decided before *Prado Navarette. S.B.* is readily distinguishable on its facts, because while the citizen's tip there was "sufficiently reliable" – mainly because it "was based on firsthand knowledge," *S.B.*, 44 A.3d at 954 – it wholly failed the test of "particular[ity] as to the individual stopped."[5] *Id*. (citation and

---

[4] Like the trial court, we consider this difference in color immaterial in the circumstances.

[5] The police in *S.B.* had no "information that isolated [the] criminal activity [*i.e.*, the tip of gun possession] to a particular street corner or particular address"; rather, the tip "indicated that the individual . . . was on a playground that was part of a larger park area which included a field area and a 'whole bunch of sports courts,' including basketball and tennis courts." *Id*. at 956. Thus the description conveyed – of a black male with white jeans, possibly a juvenile – "was potentially applicable to a large number of individuals" frequenting those places. *Id*. Indeed,

(continued…)

internal quotation marks omitted). The broad clothing and locational tip in *S.B.* enabled the kind of "'dragnet seizure of . . . youths . . . resembl[ing] a generalized description'" that this court had previously condemned. *Id*. at 956 (quoting *In re A.S.*, 614 A.2d 534, 540 (D.C. 1992)). That situation differs markedly from this case, where the 911 caller took pains – even correcting the dispatcher – to narrow the gun-bearer's location to a specific school and church on Fourth Street near the bus stop where she first saw him wearing a "windbreaker" or "raincoat thing" and dark hat, and no one else was visible between the bus stop and the church. *See S.B.*, 44 A.3d at 955 (distinguishing the affirmance in *Nixon v. United States*, 870 A.2d 100 (D.C. 2005), where "[t]here was no one else in the area" where the drug users were said to be).

---

(…continued)

the police successively encountered two groups of black juveniles in the area, each including an individual with white-colored pants or clothing; the first group "were not even in the playground," and no member, when all were patted down, had weapons. *Id*. at 956-57. Consequently, when the second group appeared, including the defendant wearing white pants, the police not only had no "rational basis for differentiating [him] from the individual in white clothing . . . they had just searched (or any other juvenile in white pants who might come along), but" – given the initial fruitless search – "the officers now had reasons to doubt the accuracy of the information provided by the citizen informant." *Id*. at 957.

Finally, appellant reads *Plummer*, *supra*, as dictating that for reasonable suspicion to ripen here, "the police officers had to have seen something" such as suspicious movements on his part "that confirmed the presence of a gun prior to his seizure." Reply Brief for Appellant at 6. *Plummer* announced no such fixed rule, as we made clear in *S.B.*, holding that "the tip [there] was sufficiently reliable such that independent corroboration of the illegality was not necessary before making [an investigative] stop. . . . " 44 A.3d at 954. *Prado Navarette* is to the same effect. *See* 134 S. Ct. at 1691 ("Nor did the absence of additional suspicious conduct, after the vehicle was first spotted by an officer, dispel the reasonable suspicion of drunk driving" furnished by the citizen's tip.). In *Prado Navarette*, the Court cited its prior "recogni[tion] that an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, 'including the claim that the object of the tip is engaged in criminal activity.'" *Id*. at 1688 (citation omitted). Here, too, the caller's tip became "reliable in its assertion of illegality," *Plummer*, 983 A.2d at 333 (citation omitted), when the police saw appellant alone in the immediate area at the location and dressed in the manner the caller described shortly after she had been frightened seeing him take out a gun.

*Affirmed*.