*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CM-594

KELBY R. GORDON, APPELLANT,

v.

UNITED STATES, APPELLEE,

Appeal from the Superior Court
of the District of Columbia
(CMD-3449-13)

(Hon. Harold Cushenberry, Jr., Trial Judge)

(Argued December 16, 2014                    Decided July 23, 2015)

*Anna B. Scanlon* for appellant.

*Vanessa Goodwin*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Kondi Kleinman*, and *Erik H. Zwicker*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:    Kelby R. Gordon appeals his conviction for

possession of marijuana following a conditional guilty plea.[1]  On appeal, Gordon argues that he was unlawfully "seized" when police officers, without reasonable articulable suspicion,[2] repeatedly questioned him about his identity for "about ten minutes."  As a result, he argues, his statements to the police and the tangible evidence found on his person should have been suppressed.  We agree with Gordon and reverse.

## I.

On March 5, 2013, Metropolitan Police Department Officer Marboo Whisnant, accompanied by three fellow officers in the Robbery Unit, "saw a group of guys loitering in the hallway" of an apartment building in Southeast Washington, D.C.  The officers pulled up to the building in an unmarked police vehicle, without flashing lights.  Wearing plain clothes with black tactical vests that displayed "Police" on the front and back, the officers carried handcuffs, a baton, pepper spray, and a gun, and entered the building through an unlocked front door.

---

[1]  A conditional guilty plea may be withdrawn if this court rules that the trial court erroneously denied a specified pretrial motion, in this case a motion to suppress evidence.  *See* Super. Ct. Crim. R. 11 (a)(2).

[2]  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Officer Whisnant described the main landing where the police entered as "a little square area," and Gordon's defense investigator described it as a "little foyer" with "four or five steps to go down and about four or five steps to go up." When the four officers entered the foyer, they saw "about three to four guys inside." Two were standing on the main landing, the man later identified as Gordon was on the upward stairs, and the other individual was on the downward stairs. Officer Whisnant testified that the whole building smelled like burnt marijuana, but that the officers did not see any of the four individuals smoking it.

Once they smelled marijuana, the officers "made contact" with the four individuals in the foyer. Officer Whisnant testified that he had previously "stumbled upon individuals smoking in that hallway." In speaking with Gordon, Officer Whisnant did not inform him either that he was free to leave or that he could refuse to speak to the officers. Officer Whisnant asked Gordon for his identification to "figure out" who he was and where he lived. Gordon replied that he did not live in the building and did not have physical identification. Gordon told the officer, however, that his name was "Khalil Mikes." He also provided his date of birth and, in response to another inquiry, added that "he had been locked up in Washington, D.C. before."

Officer Whisnant thereupon entered Gordon's proffered information into the removable laptop from his squad car to "run him through the system," which takes "[a] matter of seconds" to return a result. But he "couldn't pull him up." The officer further testified that when the police "can't pull them up, more than likely, they're lying about their name." Officer Whisnant acknowledged that he then "just kept asking him about the spelling, is there anything—when he was locked up, did he give another name, does he have a[n] alias or anything he goes by. And eventually he gave [the officers] his real name." Whereupon, the officer continued, "We ended up pulling up his picture in one [data] system. And then we ran him in WALES/NCIC and that revealed that he had a[n] outstanding warrant for a probation violation."[3] Gordon was then placed under arrest.

Gordon was asked whether he had anything illegal on his person, and Gordon replied that "he had some weed in his pants."[4] The officers ultimately

---

[3] "[T]he Washington Area Law Enforcement System (WALES) . . . lists all the active arrest warrants on file in the Superior Court's Warrant Office." *Woodward v. District of Columbia*, 387 A.2d 726, 727 (D.C. 1978). "NCIC [National Crime Information Center] is the primary nationwide database used by law enforcement to determine whether any warrants have been issued for an individual's arrest." *United States v. Boone*, 706 F. Supp. 2d 71, 76 n.2 (D.D.C. 2010).

[4] It is unclear whether the officers arrested Gordon immediately after determining that he had an outstanding warrant, or arrested him after he stated that he had weed in his pants. Officer Whisnant's PD-163 narrative and his in-court

(continued . . .)

found "eight small, clear zip-loc bags which all contained marijuana." Officer Whisnant acknowledged that Gordon did not consent to the search of his person, but he added that Gordon was "free to leave and walk away." The entire period from the time Officer Whisnant asked Gordon for identification to the officer's discovery of the outstanding warrant lasted "[a]bout 10 minutes," according to Whisnant. The trial court credited Officer Whisnant's testimony that, throughout the entire encounter, the officers spoke in a calm voice and did not draw their weapons.

Two days later, on March 7, Gordon was charged with unlawful possession of marijuana.[5] Counsel moved to suppress the marijuana and Gordon's statements to the police, arguing that the police had unlawfully seized his person without reasonable suspicion. On May 20, following a suppression hearing, the trial court denied the motion. The court found that the initial encounter with Officer Whisnant, when he asked Gordon for his name, was "consensual," and that "[i]t was perfectly reasonable for the police to talk to [Gordon] a little bit more to try to verify his identity" after Gordon apparently had provided a false name.

_____

(. . . continued)
testimony provide conflicting reports. Nothing in our analysis, however, turns on the timing of Gordon's arrest.

[5] Gordon was charged under the 2001 version of the D.C. Code. *See* D.C. Code § 48-904.01 (d) (2001).

Furthermore, added the court, while the officer was verifying Gordon's identity, Gordon "was not surrounded in a way that would have communicated to him, that is, to a reasonable person innocent of any crime, that he wasn't free to disengage from the contact." At the point the WALES search revealed that Gordon had an outstanding warrant, the court concluded, "the police had probable cause to arrest him and could search incident to that arrest." Ultimately, the trial court ruled that Gordon had not been "seized prior to [the officers'] learning about the warrant"; thus, his "Fourth Amendment rights [were] not violated."

Gordon then entered a conditional guilty plea, reserving his right to appeal the denial of the motion to suppress. The court sentenced him to thirty days of imprisonment, with credit for time served, to run concurrently with any sentence that he was serving at the time of sentencing. The court also ordered Gordon to pay $50 to the Victims of Crime Fund. This appeal followed.

## II.

Gordon contends that he was seized by the police without reasonable suspicion when the police repeatedly questioned him about his identity—an encounter that lasted approximately ten minutes. The government contends, to the contrary, that the officer's questioning did not constitute a seizure, and that even if

it did, Gordon's proffer of a false name, along with other suspicious circumstances, created the required reasonable suspicion that justified the officers' further pursuit of the truth through an identity check and warrant search. Rejecting the government's argument, we conclude that the repeated questioning of Gordon for "about ten minutes," evidencing a show of authority, amounted to a seizure, and that the officers lacked reasonable suspicion to justify the detention.

When reviewing a trial court's ruling on a motion to suppress, we must uphold the court's findings of fact unless they are clearly erroneous, but we review the court's conclusions of law *de novo*.[6] Gordon bears the burden of proving that the police violated his Fourth Amendment rights.[7] We consider the evidence in the light most favorable to the government.[8]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[9] There are three types of permissible

---

[6] *Porter v. United States*, 7 A.3d 1021, 1024 (D.C. 2010).

[7] *See Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978).

[8] *See Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007).

[9] U.S. CONST. amend. IV.

encounters between the police and citizens which do not violate the Fourth Amendment: (1) consensual encounters, which do not require any level of suspicion prior to initiation[10]; (2) investigative detentions, which if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity prior to initiation[11]; and (3) arrests, which must be supported by probable cause prior to initiation.[12] Both investigative detentions and arrests are seizures under the Fourth Amendment[13]; mere consensual encounters are not.[14]

Accordingly, a "seizure does not occur simply because a police officer approaches an individual and asks a few questions."[15] Moreover, "the police also may ask a person to do something, such as produce identification or an airline

---

[10] *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *United States v. Mendenhall*, 446 U.S. 544 (1980).

[11] *Florida v. Royer*, 460 U.S. 491 (1983).

[12] *Illinois v. Gates*, 462 U.S. 213 (1983).

[13] *Terry v. Ohio*, 392 U.S. 1, 17 (1968) (declining to distinguish a "stop and an arrest" from a seizure).

[14] A police encounter with a suspect will be "consensual," as a matter of law, and thus not a "seizure," if the suspect agrees (whether expressly so or not) to answer police questions, unconstrained by physical force or a show of police authority, and thus would reasonably believe that he was free to end the questioning at any time and leave. *See generally Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011).

[15] *Bostick*, 501 U.S. at 434.

ticket, without necessarily converting the encounter into a seizure."[16]  Thus, a seizure will have occurred "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained" someone's liberty.[17]  It follows, according to the Supreme Court, that the test for determining whether a person has been seized "is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business"[18]—in other words, that he was "not free to leave."[19]

The central question on the facts here divides into two parts:  (A) whether the police, by repeatedly asking Gordon questions about his identity for "[a]bout ten minutes," seized Gordon; and (B) if there was a seizure, whether the police had reasonable suspicion to support it.

---

[16]  *United States v. Barnes*, 496 A.2d 1040, 1044 (D.C. 1985) (internal citations omitted).

[17]  *Terry*, 392 U.S. at 19 n.16.

[18]  *Bostick*, 501 U.S. at 436-37 (internal quotation marks omitted).

[19]  *Id.* at 436; *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).

**A.**

First, we must assess whether, as Gordon contends, the police officer's repeated questioning about his identity, lasting about ten minutes, seized him prior to the officers' discovery of his outstanding warrant. The government replies that the officer's "mere questioning, in a calm and conversational tone in the public area of a residential building, where Officer Whisnant never drew his weapon, never took [Gordon's] property and at no time conveyed a message that compliance with his requests was required, did not constitute a seizure under the Fourth Amendment." Before addressing the parties' contentions, we must examine the development of this court's doctrine explaining the relationship between the persistence of police questioning and Fourth Amendment seizures.

(1)

This court has concluded on several occasions that repeated questioning can convert a consensual police-citizen encounter into a seizure. In *Guadalupe*, described as a case of "first impression,"[20] this court addressed whether two "successive police-citizen confrontations over a twenty-five to thirty minute period

---

[20] *Guadalupe v. United States*, 585 A.2d 1348, 1352 (D.C. 1991).

. . . creat[ed] such an intimidating atmosphere that a reasonable person would believe he or she was not free to leave."[21] We observed, without deciding, that the first encounter, when appellant allowed the police at Union Station to search his bag after he denied possessing narcotics,[22] was arguably consensual.[23] But after finding no contraband, the police confronted him again, fifteen minutes later, obtained consent for a body search, and found two packets of cocaine.[24] We held that a seizure occurred when the officers asked appellant to consent to the body search, because a "reasonable person, under these circumstances, could do no less than believe that the officers had focused their attention on him in furtherance of their narcotics investigation, and the questions, concluding in a request to conduct a body search, became accusatory in effect."[25] Appellant, in short, would not have felt free to leave. Even though the police "were not in uniform, spoke politely, did not display a weapon, and did not physically block a person's passageway," this

---

[21] *Id.*

[22] *Id.* at 1350.

[23] *Id.* at 1357.

[24] *Id.* at 1351.

[25] *Id.* at 1360.

court was troubled, ultimately, by the persistent nature of the officers' actions[26]—a period in that case of twenty-five to thirty minutes.

Next, in *Hawkins*, this court held that repeated questioning by police officers, in a single encounter, could amount to a seizure.[27] The officers pulled alongside appellant's double-parked car, directed appellant to park (and at some point asked him to turn off the ignition), and positioned themselves on either side of his car, an action which conformed to their training for making a traffic stop. They asked appellant three times about whether he had a weapon on him.[28] Then, without an affirmative answer, they removed him from his car, saw the butt of a gun in his pocket, and placed him under arrest. This court agreed, with one judge dissenting, that "the repeated questioning about the possession of a weapon resulted in a seizure in violation of the Fourth Amendment."[29]

---

[26] *Id.* at 1360-61.

[27] *Hawkins v. United States*, 663 A.2d 1221, 1226 (D.C. 1995) (opinion of Mack, J.); *id.* at 1230 (Farrell, J., concurring in the judgment) ("At this point, I cannot conceive that a reasonable person would not have understood the [third] question as accusatory and that his freedom to go about his business depended on giving satisfactory assurance to the officers that he was not carrying a gun." (citation and internal quotation marks omitted)).

[28] *Id.* at 1224-26.

[29] *Id.* at 1228 (opinion of Mack, J.); *see id.* at 1228-29 (Farrell, J., concurring in the judgment) ("[O]nce [Officer] Reynolds had asked appellant a third time whether he was packing a gun, a reasonable person in appellant's shoes

(continued . . .)

Later, this court in *Jackson* applied *Guadalupe* and *Hawkins* to a situation in which a police officer, without reasonable suspicion, repeatedly questioned a man standing in front of an apartment complex.[30]  The police had received an anonymous call about him from a woman who reported that she feared for her safety because there were a number of recent shootings in that area.[31]  Two police officers drove up to the apartment complex in an unmarked police car and walked over to appellant,[32] inquired whether he had any drugs or weapons on him, and asked him to raise his jacket.[33]  Without seeing drugs or weapons under his jacket, the officers questioned appellant about how long "he had been there," whether he lived in the neighborhood, whether he was visiting anyone, and who that was.[34]  Then the officer, concerned for his safety (without any described provocation), told

_____

(. . . continued)
no longer would have believed himself free to ignore the question and end the encounter with the officer." (footnote omitted)).

[30]  *Jackson v. United States*, 805 A.2d 979, 982, 988 (D.C. 2002).

[31]  *Id.* at 982.

[32]  *Id.*

[33]  *Id.*

[34]  *Id.*

appellant to "please turn around for me."[35]  As appellant turned, the officer's hand hit appellant's jacket and felt, then retrieved, a gun.[36]  Reversing the trial court's denial of appellant's motion to suppress, this court held:  "the fact that the officer remained unsatisfied and continued to question Jackson adds to the circumstances that would convey to a reasonable innocent person that he was not going to be permitted to leave until the officer was satisfied with his answers or found what he was looking for."[37]  The seizure occurred before the officer's request for appellant to turn around because the repeated questioning caused the encounter to cross "the critical line between consent and coercion."[38]

We believe that Gordon's situation is similar to appellant Jackson's.  We conclude that the officer seized Gordon by repeatedly questioning him before the police learned of his outstanding warrant.  We need not identify the exact moment when the seizure occurred; the fact that it occurred at some point after Gordon gave the name "Khalil Mikes," but before the officers discovered Gordon's outstanding warrant, is sufficient for our analysis—as we shall elaborate.

---

[35] *Id.*

[36] *Id.* at 982-83.

[37] *Id.* at 988.

[38] *Id.*

(2)

Prior to the officer's repeated questioning of Gordon about his identity, the totality of the circumstances did not indicate that a seizure had occurred. The officers pulled up to the building in an unmarked police vehicle, without flashing lights. The plainclothes officers wore black tactical vests that displayed "Police" on the front and back. In addition, the officers carried handcuffs, a baton, pepper spray, and a gun, and entered the building through an unlocked front door. Before questioning Gordon, the police spoke in a conversational tone, did not block the exit, and separated the four individuals in the lobby such that none was significantly outnumbered by the police. When Officer Whisnant initially questioned Gordon, he asked only a few routine questions related to Gordon's identity: name, address, whether he lived in the apartment complex, and whether he had previously been locked up. At this point, Gordon had not been seized; he participated in a consensual encounter.[39]

After the first database search of Gordon's first proffered name, "Kahlil Mikes," failed to return a result, however, the officers began repeatedly

---

[39] See *supra* note 14.

questioning Gordon about his identity. Officer Whisnant acknowledged that he then "just kept asking him about the spelling, is there anything—when he was locked up, did he give another name, does he have a[n] alias or anything he goes by. And eventually he gave [the officers] his real name." As we have noted, the entire period of time from when Officer Whisnant asked Gordon for identification to the officer's discovery of the outstanding warrant lasted, according to Whisnant, "[a]bout ten minutes."

Although we consider the totality of the circumstances when determining whether a seizure occurred, we note as a preliminary matter that ten minutes of questioning appears to significantly exceed the length of the police encounters in both *Hawkins* and *Jackson*. Even on the thin record before us, it is apparent that an individual in Gordon's shoes, reacting reasonably, would feel restrained by police authority and thus not free to leave. More specifically, the repeated questioning, especially when combined with the computer database searches, would convey to a reasonable person that the police were unsatisfied with his answers—to the point that he would not be free to leave until the computer database returned a positive result.[40] In sum, we see the computer check as a factor that caused a material

---

[40] *See Ramsey v. United States*, 73 A.3d 138, 147-48 (D.C. 2013) ("However, the situation changed at the point when Officer Lally requested the WALES check. At that point, we conclude, because appellant would not have felt free to leave, the encounter became a seizure—for which Officer Lally no longer

(continued . . .)

acceleration of a conversation initially deemed consensual at law to a conversation that reflected a seizure.

The government contends that this court's decision in *Brown* compels a different result, but we are not persuaded.[41]  In *Brown*, the officers, wearing vests with the word "Police" written on the front but with their guns holstered, approached a group of five to six individuals standing on the sidewalk.[42]  An officer "stopped approximately two or three feet behind appellant and, speaking in a normal tone, without . . . making any threatening gesture, asked, 'Do you have any guns, drugs, or narcotics on you?'"[43]  After appellant provided a non-responsive answer, the officer again repeated her question.[44]  At this point, appellant reached into her purse and handed the officer a bottle containing

_____

(. . . continued)
had reasonable, articulable suspicion, for the reasons already discussed." (footnote omitted)); *State v. Hall*, 115 P.3d 908, 917 (Or. 2005) ("[W]e find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check.").

[41]  *Brown v. United States*, 983 A.2d 1025 (D.C. 2009).

[42]  *Id.* at 1025.

[43]  *Id.*

[44]  *Id.*

cocaine.[45] This court cited *Hawkins* for the proposition that repeated questioning could restrain an appellant's freedom to leave if the "questioning certainly appeared to convey that compliance with the question was required."[46] Ultimately, we concluded that the fact the officer repeated her question to appellant only *once* did not rise to the level of restraining a reasonable person's freedom to leave.[47]

Repeating a question once is notably different from repeatedly questioning Gordon about his identity for ten minutes. Moreover, the appellant in *Brown* provided a non-responsive answer, so it was entirely reasonable for the officer to ask her question again. *Brown*, therefore, differs from *Johnson* and *Hawkins* because the appellants in these latter two cases provided responsive answers to the officers' questions. Neither was a case in which the suspect either misunderstood the question or the officer could not understand the answer, arguably both of which would have warranted a follow-up question; each reflected a situation in which police officers were not satisfied with the appellants' responses so they continued their questioning. Absent reasonable suspicion, this questioning is the type of conduct the Fourth Amendment is designed to prohibit, namely, repeated questioning by the police that is accusatory in nature and would make reasonable

---

[45] *Id.*

[46] *Id.* at 1026 (internal alterations and quotation marks omitted).

[47] *Id.*

persons believe they were not free to leave until the officers were satisfied. This case presents that situation. Gordon answered Officer Whisnant's questions, although falsely, and Whisnant continued to question him for "about ten minutes" in pursuit of an answer that would satisfy the officer: his real name. Because a reasonable person in these circumstances would not feel free to leave, Gordon was seized prior to the discovery of his outstanding arrest warrant.

**B.**

The government, however, contends that the police had reasonable suspicion of criminal activity to justify a seizure. It observes in its brief that Officer Whisnant and his fellow officers had seen several individuals (including Gordon) apparently [1] "loitering" in the common area of an apartment building where Gordon [2] "did not live"—a building that smelled of [3] "burnt marijuana" and was located in a [4] "high crime area." The government implicitly acknowledges that these four quoted factors, taken together, did not create reasonable suspicion of criminal activity, but it argues that such reasonable suspicion was justified when Gordon himself supplemented those factors by [5] acknowledging that he "had previously been arrested" (his lockup in D.C.) and [6] proffering a name that did not turn up in the computer database that contained "anybody that's been arrested" (indicating a likely lie).

The government does not contend that Officer Whisnant's awareness of the fifth factor, Gordon's earlier jail time, when added to the four numbered factors quoted above from the government's brief, was enough to trigger reasonable suspicion. We agree with the government's implicit concession that jail time for an unspecified crime in the unspecified past is not enough to create reasonable suspicion of criminal activity when added to Gordon's presence among individuals gathered in the public area of a building where he did not live (albeit in a high crime area), and where the police smelled burnt marijuana but could not relate Gordon or any of his compatriots to that unlawful activity. We turn, therefore, to the government's sixth factor: Gordon's apparent lie.

This court's decision in *Anderson* provides the best analysis for evaluating reasonable suspicion here.[48] In *Anderson*, police officers frisked the appellant and found contraband. The government put forth the following facts to justify the frisk:

> (1) the area was a high crime area where drug transactions take place; (2) appellant was standing with another man in the backyard of a house on a[n] alley

---

[48] *Anderson v. United States*, 658 A.2d 1036 (D.C. 1995).

during a cold winter night around midnight; (3) appellant quickly walked away from the police; (4) neither appellant nor the other man resided in the house; (5) appellant denied that he had been in the backyard despite being seen by the officers; (6) appellant placed his hands back in his pocket after being asked to remove them; and (7) appellant became nervous, rocked back and forth, and got wide-eyed upon questioning.[49]

The officers knew that, in response to the officer's question, appellant had lied, saying he had not been present in the yard, because the officers had observed him, a few minutes before, walking away from "the backyard of a house on an alley" after observing the police car.[50] This court ultimately found that these facts, including the lie, did *not* create reasonable suspicion to justify the frisk.[51]

*Anderson* provides useful guidance because the facts there provide a more compelling rationale for a seizure (though falling short) than the facts here. Of the six factors the government cited as creating reasonable suspicion to detain Gordon, three are essentially the same as factors in *Anderson*: Gordon was in a high crime area, he did not live in the residence where he was seen, and the conduct could be described as loitering. Three factors cited by the government in Gordon, however,

---

[49] *Id.* at 1038.

[50] *Id.* at 1037.

[51] *Id.* at 1040.

differ from those relied on in *Anderson*: the smell of burnt marijuana, Gordon's prior conviction, and mere suspicion of a lie. First, even if we do not credit the government's concession that it did not have reasonable suspicion prior to anticipating Gordon's lie, the burnt marijuana is not sufficient to distinguish this case from *Anderson*. Gordon's loitering in the lobby of an apartment building that smelled like burnt marijuana was less suspicious than Anderson's walking away (at midnight) from the backyard of a house where he did not live upon observing a police car—especially when Anderson (unlike Gordon) was nervous and fidgety upon being questioned by the police.[52] Second, we have already observed that Gordon's jail time was not a significant factor. Finally, in *Anderson*, the police actually knew that the appellant had lied, but in Gordon's case, the police only suspected that he had provided a false name before they questioned him further. Accordingly, if *Anderson* did not manifest facts creating reasonable suspicion that justified seizure, then surely the facts here afforded the police no reasonable basis for seizing Gordon after he identified himself as Khalil Mikes.

In support of its argument that Gordon's eventually revealed lie about his name created reasonable suspicion, the government cites *Illinois v. Wardlow*,[53] a

---

[52] *Id.* at 1037.

[53] 528 U.S. 119 (2000).

decision in which the Supreme Court characterized "[h]eadlong" and "unprovoked" flight" in a high crime area as "evasive behavior" pertinent "in determining reasonable suspicion."[54]  The government would have us equate Gordon's "unprovoked prevarication" with Wardlow's "unprovoked flight," in order to supply the additional factor necessary to justify reasonable suspicion in Gordon's case.  We decline to do so since most of the questioning occurred *before* Gordon disclosed his real name—enough questioning to result in a seizure before Gordon's lie had been confirmed (and immediately yielded the warrant).  But even if (as the government apparently would have it) mere suspicion of a lie under some circumstances would be sufficient to justify a seizure, the Court's decision in *Wardlow*, addressing unprovoked flight, would supply no justification for a seizure here.

The flight in *Wardlow* may have resulted merely from the suspect's sighting of the police, but the accosting officers observed more than flight; they saw the suspect "holding an opaque bag" in "an area known for heavy narcotics trafficking."[55]  Unprovoked flight, when coupled with concrete evidence (the bag) consistent with narcotics transactions, together warranted the seizure.  In our case, however, Gordon gave a suspected false name under circumstances otherwise

---

[54] *Id*. at 124-25.

[55] *Id*. at 121-22.

lacking concrete evidence of criminal activity. True: a lie can reflect consciousness of guilt; indeed, perhaps guilt underlay Gordon's initial response to Officer Whisnant. But a lie can also reflect merely that the person stopped is afraid of the police.[56] Accordingly, we cannot say that Gordon's initial dissembling—confirmed only after almost all the ten-minute questioning—could have erased all significance of the prior questioning and served to create the reasonable suspicion that would have justified his seizure.

For all the foregoing reasons, we conclude that Gordon was unlawfully seized without reasonable suspicion. We can confidently say that the repeated questioning seized Gordon prior to the discovery of his outstanding warrant.[57]

---

[56] *See generally City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 313 (Tenn. 2007) ("S.B. was afraid of official involvement, afraid of going to a foster home, and afraid of police in general who might force her into a possibly more dire situation.") (citation and internal quotation marks omitted); *State v. Bogdanoff*, 585 P.2d 602, 604-05 (Haw. 1978) ("[H]e was afraid of (Police Detective) Bobby Schmidt[,] and . . . he was going to lie if he ever was asked under oath about what he said in the letters because of his fear of Bobby Schmidt.").

[57] We need not answer the broader question whether a police database search as such, absent reasonable suspicion, constitutes a per se seizure. *See, e.g.*, *Ramsey v. United States*, 73 A.3d 138, 148 (D.C. 2013) (WALES check, without reasonable suspicion, was a seizure under circumstances); *United States v. Gross*, 662 F.3d 393, 401 (6th Cir. 2011) (seizure even though police did not retain ID requested of suspect); *State v. Hall*, 115 P.3d 908, 917 (Or. 2005) (seizure, under Oregon law, even when ID promptly returned to suspect after radioing police dispatch for a warrant check but before receiving result); *State v. Painter*, 676 P.2d 309, 311-12 (Or. 1984) (en banc) (seizure, under Oregon law, when police retained

(continued . . .)

**III.**

We turn, finally, to whether Gordon's statements to the police and the Ziploc bags of marijuana found on his person must be suppressed. As a general rule, if a police officer's actions violate the Fourth Amendment, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."[58] If an unlawful seizure occurred, the exclusionary rule applies unless the government proves that "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon that evidence by the original illegality."[59] According to the Supreme Court, first in *Brown v. Illinois*, relevant considerations include "the temporal proximity of the [seizure] and the [discovery of contraband], the presence of intervening circumstances, and,

_____

(. . . continued)

ID during warrant check); *State v. Warner*, 585 P.2d 681, 684, 690-91 (Or. 1978) (en banc) (seizure, under Oregon law, by show of authority when police asked defendant to place ID on table and advised defendant that he was subject of criminal investigation). *But see People v. Graves*, 553 N.E.2d 810, 813 (Ill. App. Ct. 1990) ("Nor was the deputy's running a driver's license check, under these circumstances, a seizure.").

[58] *New York v. Harris*, 495 U.S. 14, 19 (1990).

[59] *United States v. Crews*, 445 U.S. 463, 471 (1980).

particularly, the purpose and flagrancy of the official misconduct."[60]  We find no such attenuation or intervening circumstances here.

In attempting to avoid suppression under the exclusionary rule, the government argues that the outstanding arrest warrant was an intervening event sufficient to purge the taint of the illegal seizure.[61]  We cannot agree.  Applying *Brown's* three criteria,[62] we perceive no attenuating or intervening event that would trump the Fourth Amendment violation here.  We observe that virtually no time passed between the illegal seizure and the discovery of the warrant; there were no intervening circumstances other than the discovery of the arrest warrant after the unlawful seizure; and although the illegality was not flagrant, the officer's purpose at the time of the seizure—to check Gordon's identity through computer databases

---

[60]  *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (footnote and internal citations omitted).

[61]  In making this argument, the government relies on *Harris*, 495 U.S. at 14. There the Court held that if "the police have probable cause to arrest a suspect," and unlawfully enter his home to do so, "the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home" after his arrest.  *Id.* at 21 (limiting *Payton v. New York*, 445 U.S. 573 (1980)).  In the present case, however, unlike the officers in *Harris*, the police who committed the illegality were unaware of any probable cause (the arrest warrant) at the time they seized Gordon; indeed, they lacked even reasonable suspicion to justify their actions.  *See Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004) (justification for seizure is based on "facts known to the arresting officer at the time of the arrest").

[62]  *Brown*, 422 U.S. at 603-04.

that include information about warrant status—weighs in favor of suppression.[63]

Accordingly, Gordon's statements to the police and the tangible evidence immediately found on his person as a result of that search must be suppressed.

---

[63] *See United States v. Gross*, 662 F.3d 393, 404-05 (6th Cir. 2011) (discovery of valid arrest warrant—while relevant under *Brown* analysis—was insufficient under circumstances to attenuate prior unlawful seizure; "[t]o hold otherwise would create a rule that potentially allows for a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a "police hunch" that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion."); *State v. Moralez*, 300 P.3d 1090, 1094, 1100-03 (Kan. 2013) (court ordered suppression of marijuana seized from suspect; police behavior in stopping suspect for a warrants check, without reasonable suspicion of criminal activity, was too "flagrant," under *Brown* attenuation analysis, to allow the warrant to purge the taint of police illegality); *State v. Bailey*, 338 P.3d 702, 715 (Or. 2014) (en banc) ("For purposes of the federal exclusionary rule, the effect of [the purposeful police conduct], when considered along with the temporal proximity between the unlawful detention and the discovery of the challenged evidence, outweighs any value that otherwise might be assigned to the subsequent discovery of a valid arrest warrant."); *see also United States v. Lopez*, 443 F.3d 1280, 1286 (10th Cir. 2006) (affirmed district court order granting suppression of outstanding warrant—without reference to *Brown* factors—because government conceded that police "did not have probable cause or reasonable suspicion to detain Lopez until the warrants check was completed"); *United States v. Luckett*, 484 F.2d 89, 91 (9th Cir. 1973) (per curiam) ("Because [police] had no reasonable grounds to be suspicious that there might be a warrant outstanding against him," the court held, in a pre-*Brown* ruling, that "detention was unreasonable, and its fruits, therefore, were properly suppressed by the district court." (internal citation omitted)). *But cf. United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) ("It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of 'Olly, Olly, Oxen Free.' Because the arrest is lawful, a search incident to the arrest is also lawful. The lawful arrest of Avery constituted an intervening circumstance sufficient to dissipate any taint caused by the illegal automobile stop.").

* * * * *

For the foregoing reasons we reverse the order denying Gordon's motion to suppress, vacate his guilty plea, and remand the case for further proceedings consistent with this opinion.

*So ordered.*

* * * * *