McLeese, Associate Judge, dissenting:
The court holds that the police officers in this case lacked reasonable articulable suspicion to stop Mr. Miles. I respectfully dissent.
I.
We view the evidence at the suppression hearing in the light most favorable to the trial court's ruling. United States v. Lewis , 147 A.3d 236, 239 (D.C. 2016) (en banc). So viewed, the evidence indicated the following. At 8:08 a.m. on March 24, 2013, a 911 caller reported that a man "is shooting a gun" in the air in the 4500 block of Texas Avenue SE and "is heading towards Ridge Road." The 911 caller, who did not provide a name or callback number, described the shooter as a black male wearing a blue army jacket. Police officers were dispatched to the area to look for the shooter. Within a couple of minutes, someone stopped one of the officers and stated that "the suspect" was going to be in the 4300 block of E Street, which is about a block or two away from the originally indicated location, in the direction of Ridge Road. It is unclear whether the person who stopped the officer was the 911 caller or someone else. Less than a minute later, a different officer reported that a man was running in the 4300 block of F Street. Officers stopped that man, who was Mr. Miles, within a minute of that report.
Two officers testified at the suppression hearing about the stop of Mr. Miles. Officer Juan Sanchez testified that he first saw Mr. Miles near the intersection of Alabama Avenue and F Street. (That intersection falls within the 4300 block of F Street.) Mr. Miles matched the description of the shooter, and Officer Sanchez did not see anyone else who matched that description. Officer Sanchez noticed that another officer, Officer Demond James, was walking about twenty to twenty-five feet behind Mr. Miles, pointing at Mr. Miles. Officer Sanchez parked his police cruiser around the corner of F Street and Alabama Avenue, blocking the sidewalk on which Mr. Miles was walking. Officer Sanchez started getting out of his cruiser and asked Mr. Miles to stop. Mr. Miles then ran in the direction of F Street. After a brief chase, Officer Sanchez grabbed Mr. Miles. While stopping Mr. Miles, Officer Sanchez felt a hard object in Mr. Miles's waistband. Other officers came to assist, and one of them recovered a gun from Mr. Miles's waistband.
Officer Shalonda Davis testified that she first saw Mr. Miles in the 4800 block of Alabama Avenue. Mr. Miles matched the description of the shooter, and Officer Davis did not see anyone else who matched that description. Officer Davis drove past Mr. Miles and enlisted the assistance of Officer James. They drove back towards Mr. Miles, who "refused to stop and started running." Officer Davis sped up to try to stop Mr. Miles, but Officer Sanchez pulled in front of her. Officer Sanchez then stopped Mr. Miles.
The trial court denied Mr. Miles's motion to suppress, concluding that the officers had reasonable articulable suspicion. With respect to the circumstances of the stop, the trial court indicated that Mr. Miles started running after Officer Sanchez asked Mr. Miles to stop.
II.
In my view, the trial court correctly held that the officers had reasonable articulable suspicion to stop Mr. Miles.
First, the police had received a 911 call stating that a man "is shooting a gun" in the air. Although the 911 caller did not provide a name or callback number, the Supreme Court has held that "a reasonable *647 officer could conclude that a false tipster would think twice before" calling 911, given that 911 calls "allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." Navarette v. California , --- U.S. ----, 134 S.Ct. 1683, 1689-90, 188 L.Ed.2d 680 (2014). The caller's use of the 911 system thus is an "indicator of veracity." Id. at 1689. The opinion for the court suggests, however, that either (1) the 911 system in this case "did not work in the way" the 911 system operated in Navarette or (2) the 911 caller in this case "inten[ded] to remain anonymous and not provide a callback number." Ante at 640 n.12. Those suggestions are entirely speculative, and it might well be that instead the 911 operator (quite reasonably) did not attempt to ascertain the 911 caller's number while in the midst of dispatching officers to respond to a call about a man shooting a gun. The contrary speculation of the opinion for the court is incompatible with our acknowledged obligation to view the evidence in the light most favorable to the trial court's ruling. Ante at 637. In any event, the question is not whether the 911 operator in fact would have been able to trace this particular 911 call, or even whether the District's 911 system generally is able to trace 911 calls. Rather, the question is whether "a reasonable officer could conclude that a false tipster would think twice before" calling 911. Navarette , 134 S.Ct. at 1690. We have already held that the absence of evidence about the particular capabilities of the District's 911 system does not undermine the reasonableness of that conclusion. Jackson v. United States , 109 A.3d 1105, 1108 (D.C. 2015).
Second, the 911 call supported "an inference that the information was based on personal observation." Goldston v. United States , 562 A.2d 96, 101 (D.C. 1989). Specifically, the 911 caller (1) used the present tense to describe conduct-shooting a gun in the air-that would be both visible and very audible, cf., e.g. , Beckner v. Commonwealth , 15 Va.App. 533, 425 S.E.2d 530, 533 (1993) ("[I]mplications of a personal basis of knowledge may arise when an individual reports that a person ... 'is displaying a gun.' "); and (2) specifically described the shooter and the shooter's direction of travel, see, e.g. , State v. Sousa , 151 N.H. 297, 855 A.2d 1284, 1290 (2004) (weight to be given to anonymous tip depends among other things on whether "tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed" offense). Cf. generally, e.g. , Porter v. United States , 7 A.3d 1021, 1025 (D.C. 2010) ("[I]f an informant's report contains detailed, current information, it is probably based on first-hand perception ....") (internal quotation marks omitted).
Third, someone approached one of the officers and provided further information about where to find the suspect. It is unclear whether this person was the 911 caller or a different person, and this person's basis for knowledge is also unclear. Notwithstanding these limitations, this face-to-face report added to the officers' grounds for stopping Mr. Miles. See, e.g. , Nixon v. United States , 870 A.2d 100, 105 (D.C. 2005) ("Information conveyed to the police by such in-person informants, even if they do not reveal their names, is not subject to the same scrutiny as purely anonymous tips. [T]he fact that the tip was given in person, rather than over the telephone, further strengthens its credibility.") (citation and internal quotation marks omitted); United States v. Spotts , 275 F.3d 714, 722 (8th Cir. 2002) (giving weight to existence of "multiple sources of suspicion").
Fourth, police officers promptly corroborated innocent details of the 911 caller's information. They found Mr. Miles, who matched the 911 caller's description, where he would have been expected to be based *648 on the 911 caller's information about the shooter's location and direction of travel, and they saw no one else who matched that description. See, e.g. , Green v. United States , 974 A.2d 248, 256 (D.C. 2009) (corroboration of innocent details, such as suspect's description, bolsters reliability of anonymous tip). Although the opinion for the court states at one point that the caller's description "matched only weakly Mr. Miles's actual appearance," ante at 639, that statement is puzzling given the court's acknowledgment that any concern about the accuracy of the description was "averted" by the trial court's factual finding that Mr. Miles matched the caller's description, ante at 639. See also ante at 637 (acknowledging that we defer to trial court's factual findings unless clearly erroneous).
Fifth, Mr. Miles fled after being asked to stop. See, e.g. , Illinois v. Wardlow , 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").
Taken together, these circumstances more than sufficed to establish the "minimal level of objective justification," Wardlow , 528 U.S. at 123, 120 S.Ct. 673, required to permit the officers to stop Mr. Miles. See generally, e.g. , Robinson v. United States , 76 A.3d 329, 336 (D.C. 2013) ("The reasonable, articulable suspicion standard requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence. It is not onerous, but it is not toothless either .... Unparticularized suspicion and inarticulate hunches are not sufficient ....") (citations and internal quotation marks omitted). The Supreme Court, this court, and other courts have upheld stops based on circumstances that were equally or even less suspicious. See, e.g. , Navarette , 134 S.Ct. at 1686-92 (upholding stop based on anonymous 911 call that truck had run caller off road, where caller specifically described truck and officers later found truck where it would have been expected to be based on information provided by 911 caller); Wardlow , 528 U.S. at 121-26, 120 S.Ct. 673 (upholding stop based on suspect's unprovoked flight from police in high-crime area); Jackson , 109 A.3d at 1106-09 (upholding stop based on anonymous 911 call that caller had seen man with gun, where officers found suspect matching description given by caller in immediate area indicated by caller); In re D.M. , 566 Pa. 445, 781 A.2d 1161, 1162-65 (2001) (upholding stop based on anonymous 911 call about man with gun, where officers found suspect who matched description provided by caller in area indicated by caller, and suspect fled after officer directed suspect to come over).[21]
*649 Neither Mr. Miles nor the opinion for the court cites a single case from any court holding that police lacked reasonable articulable suspicion in circumstances comparable to those of the present case, and I am not aware of any such case. The opinion for the court does cite a few out-of-jurisdiction cases that it describes as "involving an anonymous tip and various acts of avoidance or more overt flight." Ante at 645. The opinion does not assert that the basis for suspicion in those cases was comparable to the basis for suspicion in this case. Ante at 645-46. In fact, the basis for suspicion in each of the cited cases was substantially weaker than the basis for suspicion in the present case. United States v. Lowe , 791 F.3d 424, 434-35 (3d Cir. 2015) (suspect stopped based on anonymous tip did not flee before stop but rather at most "stepped back" in way that court determined was not suspicious); United States v. Freeman , 735 F.3d 92, 101-02 (2d Cir. 2013) (suspect stopped based on anonymous tip did not flee before stop but rather lawfully ignored police and kept on walking at same pace); T.P. v. State , 224 So.3d 792, 794-95 (Fla. Dist. Ct. App. 2017) (although suspect did initially flee from police, anonymous tip consisted of "vague description of a light-skinned black male wearing shorts and a shirt looking through windows"); Lee v. State , 868 So.2d 577, 578-83 (Fla. Dist. Ct. App. 2004) (anonymous tip provided no description of suspect other than race and gender, and suspect did not flee but rather "walked quickly" away from police).
Although this court has said that " 'case matching' is of limited utility" in deciding Fourth Amendment issues, Gomez v. United States , 597 A.2d 884, 889 (D.C. 1991), we have also acknowledged that prior "cases are helpful illustrations of the factors that may add up to reasonable suspicion in the totality of the circumstances." Hampleton v. United States , 10 A.3d 137, 144 n.9 (D.C. 2010). In my view, the opinion of the court contradicts clear guidance that we must take from the prior decisions of the Supreme Court and this court.
III.
The opinion of the court relies heavily on the view that Mr. Miles's flight was "provoked" by the officers, and thus was significantly less suspicious than unprovoked flight. Ante at 640-46. I disagree.
In concluding that Mr. Miles's flight was provoked, the opinion of the court relies on trial evidence that Officer Sanchez drove onto the sidewalk in order to block Mr. Miles's path. Ante at 643. It is unclear, however, whether this court can appropriately "rely on undisputed trial evidence to ... reverse the trial court's ruling, where the losing party failed to renew the motion to suppress based on the new evidence at trial." Wade v. United States , 173 A.3d 87, 92 (D.C. 2017) (citing United States v. Hicks , 298 U.S. App. D.C. 225, 227, 978 F.2d 722, 724 (1993) ("The problem for Hicks is that he did not again move to suppress when this evidence came to light at trial. An appellate court should not rely on evidence first produced at trial to reverse a pre-trial denial of a suppression motion not renewed at trial.") ).
Even if taking such an approach might be appropriate in some circumstances, doing *650 so in the present case is unwarranted, because the trial testimony at issue was not undisputed. To the contrary, there was conflicting evidence about whether Officer Sanchez pulled onto the sidewalk before Mr. Miles fled. Officer Davis's suppression-hearing testimony indicated that Mr. Miles fled before Officer Sanchez drove past her cruiser and towards Mr. Miles. Officer Davis's trial testimony was to the same effect. Officer Sanchez's suppression-hearing testimony-the version that the trial court adopted at the close of the suppression hearing-indicated that Officer Sanchez blocked the sidewalk before Mr. Miles fled, but did not indicate that Officer Sanchez drove up onto the sidewalk. Officer James's trial testimony was similar in that respect to Officer Sanchez's suppression-hearing testimony. For his part, Mr. Miles denied at trial that he fled and did not testify that any officer drove up onto the sidewalk. In sum, the opinion for the court adopts a version of the events-that Mr. Miles fled after Officer Sanchez drove up onto the sidewalk to block Mr. Miles's path-that the trial court never found, that no witness testified to, and that was contradicted by the testimony of several witnesses, including Mr. Miles himself. Whatever its proper scope, the doctrine permitting reliance on undisputed trial evidence surely does not authorize this court to reverse the trial court based on such a patchwork version of the facts.
It is true, as the opinion for the court notes, that "[n]o one balked" at trial when Officer Davis testified that Officer Sanchez drove up onto the sidewalk after Mr. Miles had started running. Ante at 643-44 n.17. In isolation, though, that testimony would have given no one reason to balk. And if Mr. Miles wanted to argue that his flight was provoked by Officer Sanchez's driving onto the sidewalk, he should have developed evidence to that effect at the suppression hearing. Failing that, he should have renewed his suppression motion at trial, so that the parties could have made a record on the issue and the trial court could have made an informed finding. Because Mr. Miles neither elicited pertinent testimony at the suppression hearing nor renewed his suppression motion at trial, this court has no valid basis upon which to conclude that Officer Sanchez drove up onto the sidewalk before Mr. Miles fled.
In support of its conclusion that Mr. Miles's flight was provoked, the opinion of the court also relies on Officer Sanchez's testimony that Officer James was walking behind Mr. Miles before Mr. Miles fled. Ante at 643. That is irrelevant, however, in the absence of any indication that Officer Sanchez had reason to believe that Mr. Miles was aware of Officer James's presence some twenty to twenty-five feet behind Mr. Miles. See generally, e.g. , Plumhoff v. Rickard , --- U.S. ----, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) ("[The] reasonableness of a particular seizure under the Fourth Amendment" is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (internal quotation marks omitted). Even if one were to assume that Officer Sanchez did have reason to believe that Mr. Miles had seen Officer James, the police conduct in this case would still be substantially less provocative than the conduct in Henson v. United States , 55 A.3d 859, 862, 868-70 (D.C. 2012) (rejecting argument that suspect's flight was provoked, where suspect fled after uniformed officer grabbed suspect's arm and said words to effect of "[W]here are you going?"). The same is true even if Officer Sanchez actually drove his cruiser up onto the sidewalk to block Mr. Miles's path, given the absence of any suggestion that Officer Sanchez drove at a high rate of speed or was dangerously near to Mr. Miles. For these reasons, I cannot agree with the opinion of the court *651 that the officers in this case should have realized that their conduct was so provocative that Mr. Miles's flight "fail[ed] to raise an inference of a guilty conscience." Henson , 55 A.3d at 869.
The 911 call in this case that a man was shooting a gun might have been baseless, even though officers confirmed its innocent details. The face-to-face report about the suspect's location might also have been baseless. And Mr. Miles might have had innocent reasons for fleeing from the police. As the Supreme Court has repeatedly held, however, "reasonable suspicion need not rule out the possibility of innocent conduct." Navarette , 134 S.Ct. at 1691 (internal quotation marks omitted). See generally, e.g. , United States v. Arvizu , 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for ... stopping the [suspect], making the stop reasonable within the meaning of the Fourth Amendment."). In my view, controlling precedent establishes that the officers' decision to stop Mr. Miles was lawful. I therefore respectfully dissent.

The opinion for the court suggests that Wardlow 's holding rested not only on the suspect's flight in a high-crime area but also on the fact that the suspect had an opaque bag. Ante at 640-41. This court has correctly rejected that interpretation of Wardlow . Wilson v. United States , 802 A.2d 367, 371 (D.C. 2002) (fact that suspect was holding opaque bag "played no part" in Supreme Court's reasoning in Wardlow ). The opinion for the Court in Wardlow did mention the opaque bag, but only in the fact section of its opinion, when describing the sequence of events that led to the discovery of the gun that Mr. Wardlow was convicted of unlawfully possessing. 528 U.S. at 122, 120 S.Ct. 673. When the Supreme Court explained the circumstances it relied upon to find the stop lawful, it made no mention of the opaque bag. Id. at 123-26, 120 S.Ct. 673. I do not think that the holding in Wardlow can reasonably be interpreted as resting on a fact that the Supreme Court did not mention in explaining the reasons for its holding. As the opinion of the court notes, ante at 640-41, we have on one occasion interpreted Wardlow as resting in part on the presence of the opaque bag. Gordon v. United States , 120 A.3d 73, 84 (D.C. 2015). Although I was a member of the division in Gordon , I have come to believe that Gordon is in this respect incorrect. More importantly, Gordon is contrary to our prior controlling opinion in Wilson , which the court did not mention in Gordon . Under the circumstances, we are required to follow Wilson rather than Gordon . See, e.g. , Thomas v. United States , 731 A.2d 415, 420 n.6 (D.C. 1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one."). In any event, the grounds for reasonable articulable suspicion in this case are significantly stronger than those in Wardlow even taking into account Mr. Wardlow's possession of the opaque bag.